# IN THE SUPREME COURT OF TEXAS

No. 15-0240

EXXON MOBIL CORPORATION, WHM CUSTOM SERVICES, INC.,
AND DISA, INC., PETITIONERS,

v.

GILBERTO RINCONES, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued February 7, 2017**

JUSTICE BROWN delivered the opinion of the Court.

JUSTICE LEHRMANN did not participate in the decision.

This is a complex employment-discrimination case implicating the Texas Commission on Human Rights Act and multiple common-law tort doctrines. It arises from a report that Gilberto Rincones, a refinery technician, failed an employment-related drug test. Rincones sued his employer, WHM Custom Services, Inc.; the owner of the refinery, Exxon Mobil; and the drug-testing administrator, DISA, Inc. The trial court granted summary judgment for Exxon, WHM, and DISA on all but one claim, which it dismissed for lack of jurisdiction. In a wide-ranging opinion on rehearing, the court of appeals reversed the trial court's take-nothing judgment and reinstated nine of Rincones's claims. We reverse in part, vacate in part, and render judgment reinstating the trial

court's final take-nothing judgment against Rincones, holding, among other things, that Texas law recognizes no claim for compelled self-defamation.

## I. Background

Gilberto Rincones was employed as a catalyst technician by WHM Custom Services. WHM assigned him to work at Exxon's Baytown refinery. Exxon retains WHM as an independent contractor to build and repair the refinery's catalyst systems. Because of the potentially hazardous nature of the work at the Baytown refinery, Exxon requires its contractors, including WHM, to have written drug policies. Those policies must meet the requirements of the Houston Area Substance Abuse Program, a project of the Houston Business Roundtable. When WHM hired Rincones, he signed forms acknowledging its substance-abuse policy and procedures and consenting to drug and alcohol testing.

The Substance Abuse Program requires random drug testing by third-party administrators, who are responsible for providing collection, testing, and reporting services conducted by government-certified laboratories and licensed medical professionals. The program maintains a list of third-party administrators that satisfy its requirements. Under the Substance Abuse Program, third-party administrators classify contractors' employees as either "active" or "inactive." Any employee who violates the program's requirements, such as testing positive for a forbidden substance, is classified as inactive. Exxon mandates that no person with an inactive status may work at the Baytown Refinery until completion of a rehabilitation process outlined by the program.

WHM designated DISA, which is on the program's approved list, as its third-party administrator. In early April 2008, DISA randomly selected Rincones to take a drug test, to which

2

he submitted on April 10. On April 14, DISA notified Rincones that his sample tested positive for marijuana use. In accordance with the Substance Abuse Program, DISA designated Rincones as inactive, requiring him to complete certain rehabilitation requirements before returning to work.

Rincones consistently maintains he did not use illegal drugs. He argued the sample tested was not actually his; he complained to WHM of supposedly "questionable testing procedures he witnessed when he gave the sample"; and he requested that he be allowed to retest with a new sample. A WHM human-resources manager told Rincones he had to work with DISA rather than WHM to regain active status. DISA offered to retest the part of the sample retained by the lab. But Rincones never fulfilled the requirements of the Substance Abuse Program for returning to active DISA status.

Instead, on April 15, Rincones submitted a urine sample to a private doctor. This test was negative, though the screening threshold used in this non-random test was substantially higher than the level required by the Substance Abuse Program. Rincones informed WHM of the negative test results and offered them as proof that the DISA drug-test results were incorrect. WHM and DISA did not change their position based on these privately obtained results, as the testing was not sanctioned by the program.

Rincones never attempted to complete a rehabilitation program. And though WHM never formally terminated Rincones, his inactive status precluded WHM from assigning him any work. Rincones filed for unemployment-compensation benefits with the Texas Workforce Commission in August 2008. A month later the commission determined that Rincones had been discharged

because of the results of the drug test but was eligible for unemployment benefits. He later obtained employment with another company.

Rincones filed a discrimination charge with the Texas Workforce Commission – Civil Rights Division in October 2008, complaining "that other non[-]Hispanic employees were treated differently" under the Substance Abuse Program. In April 2009, Rincones filed this lawsuit against WHM and Dallas Mentor, an alleged "misidentified" party in place of DISA. Rincones then amended his original petition in July 2009 to add Exxon as a defendant and amended it a fourth time in August 2010 to add DISA. He asserted various claims against each of the three defendants, the relevant details of which we discuss below.

Exxon and WHM moved to dismiss Rincones's pattern-or-practice discrimination claim for lack of subject-matter jurisdiction. They argued that Rincones did not exhaust his administrative remedies by failing to include the facts supporting the claim in his Texas Workforce Commission administrative charge. The trial court dismissed the claim. Exxon and WHM also moved for traditional and no-evidence summary judgment on the remainder of Rincones's claims against them. DISA moved for traditional summary judgment. The trial court granted summary judgment against Rincones on the remaining claims against Exxon, WHM, and DISA and entered a take-nothing judgment. Rincones nonsuited all of his other claims, making judgment against him final.

Rincones timely appealed, raising sixteen issues in the court of appeals. 457 S.W.3d 221, 255 (Tex. App.—Corpus Christi 2015). Withdrawing its first opinion and issuing a new one on rehearing, the court of appeals overruled some of Rincones's issues, but also reversed the trial court's judgment on multiple grounds and remanded. *Id.* at 231, 254. With respect to Exxon, the

court of appeals reinstated three of Rincones's claims: negligence, tortious interference with an employment contract, and pattern-or-practice discrimination. *Id.* at 249, 251–53. It reinstated four claims against WHM: individual discrimination, retaliation, pattern-or-practice discrimination, and compelled self-defamation. *Id.* at 223–49. It reinstated two claims against DISA: tortious interference with a contract and negligence. *Id.* at 253–56.

We address each of these nine claims against the three petitioners in turn.

## II. Claims against WHM

WHM, Rincones's employer, argues the court of appeals erred by reversing the trial court's take-nothing judgment as to Rincones's claims for compelled self-defamation, discrimination, retaliation, and pattern-or-practice discrimination. Rincones argues that fact issues precluded summary judgment and the court of appeals correctly revived his claims. We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* Even under this exacting standard, we nevertheless conclude that the trial court correctly granted summary judgment for WHM and the court of appeals erred by reversing.

### A. Defamation

The court of appeals affirmed summary judgment for the petitioners on Rincones's defamation claim. Yet it concluded "that Texas law recognizes a cause of action for defamation based on compelled self-publication in certain limited circumstances" and revived Rincones's cause of action for compelled self-defamation against WHM. 457 S.W.3d at 244–48. We disagree and reverse,

5

holding that the publication element of a defamation claim cannot be satisfied by a theory of "compelled" self-disclosure and there is no independent cause of action for compelled self-defamation.

The elements of a defamation claim "include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (citing *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). "Publication" occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is "capable of understanding their defamatory import and in such a way that the third person did so understand." *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.). As a general rule a defendant who communicates a defamatory statement directly to the defamed person, who then relays it to a third person, has not published the matter to the third person. *See* RESTATEMENT (SECOND) OF TORTS § 577 cmt. m (1977).

Nevertheless, some Texas courts of appeals and sister-state courts have recognized an exception to that general rule, often in defamation suits brought by former employees against their former employers. The theory is that a former employee's publication to a third party can satisfy the publication element because the former employee is effectively compelled to publish the defamatory statement to prospective employers when asked why he left his former employment. *See Lewis v. Equitable Life Assurance Soc'y of U.S.*, 389 N.W.2d 876 (Minn. 1986); *cf. Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759 (Conn. 2004). According to these courts, compelled self-publication holds the originator of a "defamatory statement liable for damages caused by the statement where the

6

originator knows, or should know, of circumstances whereby the defamed person has no reasonable

means of avoiding publication of the statement or avoiding the resulting damages; in other words,

in cases where the defamed person was compelled to publish the statement." *Lewis*, 389 N.W.2d at

888.

A handful of states have recognized the theory in various forms,[1] and a narrow version has

gained acceptance in the Restatement (Second) of Torts. The Restatement provides that a publication

may occur despite the general rule "[i]f the defamed person's transmission of the communication

to the third person was made . . . without an awareness of the defamatory nature of the matter and

if the circumstances indicated that communication to a third party would be likely . . . ."

RESTATEMENT (SECOND) OF TORTS § 577 cmt. m (1977).[2]

Several of our courts of appeals also have entertained the notion of compelled self-

defamation. The court of appeals in this case relied on its own precedent from 1980: *First State Bank*

*of Corpus Christi v. Ake*, 606 S.W.2d 696, 701 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd

n.r.e.) ("One who communicates defamatory matter directly to the defamed person, who himself

communicates it to a third party, has not published the matter to the third person if there are no other

---

[1] *See, e.g.*, *Lewis*, 389 N.W.2d at 886–88; *Neighbors v. Kirksville Coll. of Osteopathic Med.*, 694 S.W.2d 822, 824 (Mo. Ct. App. 1985); *McKinney v. Cty. of Santa Clara*, 110 Cal. App. 3d 787, 796 (1980); *Grist v. Upjohn Co.*, 168 N.W.2d 389, 405–06 (Mich. Ct. App. 1969). The Colorado Supreme Court recognized a claim for compelled self-defamation, but the state's legislature has since restricted such a claim. *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1344 (Colo. 1988); COLO. REV. STAT. ANN. § 13-25-125.5 (Westlaw through laws effective April 13, 2017) ("Self-publication, either orally or in writing, of the defamatory statement to a third person by the person making such allegation shall not give rise to a claim for libel or slander against the person who originally communicated the defamatory statement."). The Minnesota legislature similarly limited the *Lewis* court's holding. *See* MINN. STAT. ANN. § 181.933(2) (Westlaw through laws of April 28, 2017).

[2] A typical case would involve a plaintiff who received a defamatory message and required assistance reading or understanding it—self-publication would occur when the plaintiff asked another person for assistance understanding the message. *See* Markita D. Cooper, *Between a Rock and a Hard Case: Time for a New Doctrine of Compelled Self-Publication*, 72 NOTRE DAME L. REV. 373, 385 (1997) (discussing *Lane v. Schilling*, 279 P. 267 (Or. 1929)).

circumstances. If the circumstances indicated that communication to a third party is likely, however, a publication may properly be held to have occurred."). The Dallas and San Antonio Courts of Appeals have relied on *Ake* to reach similar conclusions. *Chasewood Constr. Co. v. Rico*, 696 S.W.2d 439, 445 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (relying on *Ake* to conclude that a supervisor, as a reasonably prudent person, should have expected his defamation of the employee would be communicated to others by the employee); *DeWald v. Home Depot*, No. 05-98-00013-CV, 2000 WL 1207124, at *9 (Tex. App.—Dallas Aug. 25, 2000, no pet.) ("[E]mployers should expect terminated employees to share with prospective employers the alleged reasons for their termination. If an employer gives untrue defamatory reasons for terminating an employee, it should recognize that such conduct creates an unreasonable risk that the defamatory matter will be communicated to prospective employers."); *see also Purcell v. Seguin State Bank & Tr. Co.*, 999 F.2d 950, 959 (5th Cir. 1993) (finding, based on courts of appeals' decisions, that "Texas courts . . . recognize the narrow exception of self-compelled defamation").

More recently, however, both the Dallas and San Antonio courts hesitated to extend their recognition of the tort, in part because this Court has never adopted it. *See Austin*, 118 S.W.3d at 499 (noting this Court has not recognized the claim and declining to decide the issue because an element of the claim was negated); *Gonzales v. Levi Strauss & Co.*, 70 S.W.3d 278, 283 (Tex. App.—San Antonio 2002, no pet.) (reciting the elements of self-compelled defamation but finding no evidence to support them); *see also AccuBanc Mortg. Corp. v. Drummonds*, 938 S.W.2d 135, 148 (Tex. App.—Fort Worth 1996, writ denied) (same).

8

Today we resolve the issue. We expressly decline to recognize a theory of compelled self-defamation in Texas. In rejecting it, we join an emerging majority of state courts that have considered the issue, including those in Connecticut, Massachusetts, Hawaii, Tennessee, Iowa, Pennsylvania, and New York.[3]

The court of appeals here found support for its conclusions in our *Neely v. Wilson* opinion. 418 S.W.3d 52 (Tex. 2013). That reliance was misplaced. *Neely* involved a third party's re-publication of a defamatory statement. *Id.* at 61. Dr. Neely, a neurosurgeon, did not repeat defamatory statements about himself to others. He alleged defamation by a reporter and television station that repeated a third party's allegations. *Id.* We reaffirmed "a well-settled legal principle that one is liable for republishing the defamatory statement of another." *Id.* From there, the court of appeals reasoned, "it is a small step to impose liability on one who communicates a defamatory statement knowing or reasonably foreseeing that the plaintiff would be compelled to repeat the defamatory statement to others." 457 S.W.3d at 248. We disagree and refuse to take that step.

Our holding today is in no tension with *Neely*. Indeed, our holding today is consistent with our precedent. More than half a century ago, we reaffirmed the rule "that if the publication of which

---

[3] The decisions that we believe support our position were made on a wide variety of reasoning and have come from a mixture of courts of last resort and intermediate appellate courts. *See, e.g.*, *Cweklinsky*, 837 A.2d at 759; *White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034 (Mass. 2004); *Gonsalves v. Nissan Motor Corp. in Haw., Ltd.*, 58 P.3d 1196 (Haw. 2002); *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74 (Iowa 2001); *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569 (Tenn. 1999); *Atkins v. Indus. Telecomm. Ass'n.*, 660 A.2d 885, 894–95 (D.C. App. 1995) ("Only a minority of jurisdictions have recognized a defamation claim based on compelled self-publication, and those so holding do not agree on the basis on which to ground liability."); *Wieder v. Chem. Bank*, 202 A.D.2d 168 (N.Y. App. Div. 1994) (mem. op.) (citing *Weintraub v. Phillips, Nizer, Benjamin, Krim, & Ballon*, 172 A.D.2d 254 (N.Y. App. Div. 1991) (mem. op.)); *Layne v. Builders Plumbing Supply Co.*, 569 N.E.2d 1104 (Ill. App. Ct. 1991); *Yetter v. Ward Trucking Corp.*, 585 A.2d 1022 (Pa. Super. Ct. 1991); *Gore v. Health-Tex, Inc.*, 567 So. 2d 1307, 1308 (Ala. 1990); *Brantley v. Heller*, 112 S.E.2d 685 (Ga. Ct. App. 1960) (limiting an earlier holding that approved of compelled self-defamation to its facts); *Lunz v. Neuman*, 290 P.2d 697 (Wash. 1955).

the plaintiff complains was consented to, authorized, invited or procured by the plaintiff, he cannot recover for injuries sustained by reason of the publication." *Lyle v. Waddle*, 188 S.W.2d 770, 772 (Tex. 1945). Declining to recognize compelled self-defamation is a natural extension of this rule.

Further, were we to recognize compelled self-defamation, we would risk discouraging plaintiffs from mitigating damages to their own reputations. *See Cweklinsky*, 837 A.2d at 767. Allowing the claim could enable any employee who disagrees with his employer's reason for firing him to unilaterally create an actionable tort against the employer. And "the availability of increased damages from such a claim might encourage publication of a defamatory statement by a plaintiff who reasonably could have avoided such republication or could have tried to explain to a prospective employer the true nature of the situation and to contradict the defamatory statement." *Layne v. Builders Plumbing Supply Co.*, 569 N.E.2d 1104, 1111 (Ill. App. Ct. 1991).

Additionally, we fear that accepting the compelled self-defamation doctrine would unacceptably impinge on the at-will employment doctrine. "For well over a century, the general rule in this State, as in most American jurisdictions, has been that absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). We have declined to recognize a claim against employers for negligent investigation of at-will employees' alleged misconduct because, "[b]y definition, the employment-at-will doctrine does not require an employer to be reasonable, or even careful, in making its termination decisions." *See Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 609 (Tex. 2002). By its nature, the claim would require employers to conduct investigations and make accurate findings before taking any

10

action against an employee or risk being sued. We have already declined to recognize that duty. Moreover, as the Seventh Circuit has noted, combining the doctrines of self-defamation and defamation per se "gives employees who regret not having negotiated an employment contract a tort surrogate for it." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994), *cert. denied*, 514 U.S. 1111 (1995). For these reasons, we are convinced compelled self-defamation is incompatible with Texas's at-will employment system.

Recognizing compelled self-defamation could also stifle workplace communication by "chill[ing] honest evaluation and communication about employee performance, as employers strive to protect themselves from defamation claims by adopting policies of providing only 'name, rank and serial number' references." *See* Markita D. Cooper, *Between a Rock and a Hard Case: Time for a New Doctrine of Compelled Self-Publication*, 72 NOTRE DAME L. REV. 373, 378 (1997); *see also White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1038 (Mass. 2004). And we agree with our sister court in Massachusetts that "[t]he expenditure of time, resources, and money required to defend a claim of compelled self-defamation inevitably will induce self-censorship by employers." *White*, 809 N.E.2d at 1038.

Finally, the court of appeals here seems to have understood compelled self-defamation to be an independent cause of action. But it is probably better understood as an exception to the publication requirement of a standard defamation claim. *See Cweklinsky*, 837 A.2d at 764, 769; *see generally* Cooper, *supra* at 11. Texans' right to sue for reputational torts is not impinged by declining to adopt a doctrine that modifies a plaintiff's burden on one element of a defamation claim. *See* TEX. CONST. art. I, §§ 8, 13.

11

Because we expressly decline to recognize compelled self-defamation, we reverse the court of appeals and render judgment for WHM on this claim.

**B. Discrimination Based on Race or National Origin**

Rincones alleges he was discharged based on his race (Hispanic) and national origin ("Mexican heritage/descent"). The crux of this claim is that "other non-Hispanic employees . . . were allowed to retest as a result of a false positive result and allowed to return to work," but he was not.

As an initial matter, WHM argues that the court of appeals improperly relied on certain late-filed summary-judgment evidence. But the court of appeals' error, if any, has been waived. Even objected-to evidence remains valid summary-judgment proof "unless an order sustaining the objection is reduced to writing, signed, and entered of record." *Mitchell v. Baylor Univ. Med. Ctr.*, 109 S.W.3d 838, 842 (Tex. App.—Austin 2003, no pet.). The record contains no order sustaining the objection.

The Legislature enacted the Texas Commission on Human Rights Act "to address the specific evil of discrimination and retaliation in the workplace." *City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex. 2008). As relevant here, an employer commits an unlawful employment practice if, because of race or national origin, the employer discharges an individual or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment. *See* TEX. LAB. CODE § 21.051(1).

"Texas courts follow the settled approach of the U.S. Supreme Court in recognizing two alternative methods of proof in discriminatory treatment cases." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012).

The first method, rather straightforward, involves proving discriminatory intent via direct evidence of what the defendant did and said. However, the High Court recognized that motives are often more covert than overt, making direct evidence of forbidden animus hard to come by. So to make matters easier for discrimination plaintiffs, the Court created the burden-shifting mechanism of *McDonnell Douglas.* Under this framework, the plaintiff is entitled to a presumption of discrimination if she meets the "minimal" initial burden of establishing a prima facie case of discrimination.

*Id.* (internal citations omitted).

Under the *McDonnell Douglas* framework and our case law, the precise elements of this prima facie showing vary depending on the circumstances. *Id.* For Rincones to prevail here, he must first establish a prima facie case of race or national-origin discrimination by showing: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) WHM gave preferential treatment to a similarly situated employee outside the protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (providing the seminal framework); *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam) (adopting the framework). The U.S. Supreme Court has emphasized that the standard for establishing a prima facie case is "not onerous." *Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338, 1354 (2015).

WHM argues that Rincones did not establish his prima facie case because he failed to produce evidence of similarly situated persons who were treated preferentially, that is, who were allowed to retest and return to work. Without establishing this prima facie case, Rincones's claim fails as a matter of law.

"Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Ysleta Indep. Sch. Dist. v.*

13

*Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam). "The situations and conduct of the employees in question must be 'nearly identical.'" *Reyes*, 272 S.W.3d at 594 (citation omitted); *see also Edwards v. Grand Casinos of Miss., Inc.*, 145 F. App'x 946, 948 n.2 (5th Cir. 2005) (per curiam) (noting that as to the similarly situated requirement, circumstances surrounding the compared employees must be "nearly identical")*; Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (per curiam) (holding plaintiff's burden was "to show that the misconduct for which she was discharged was nearly identical to that engaged in by a male employee whom [her employer] retained" (internal quotation omitted)).

"Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *Reyes*, 272 S.W.3d at 594; *see also Ineichen v. Ameritech*, 410 F.3d 958, 960–61 (7th Cir. 2005) ("This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'" (citations omitted)). Employees who hold different jobs are not similarly situated and, "ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).

Facing WHM's summary-judgment motion, Rincones argued that unresolved fact issues remained because he produced evidence identifying three non-Hispanic WHM employees who were

treated preferentially: Tony Davis, Mark Sweet, and Darren Cooper.[4] These three men, Rincones claimed, "were allowed to continue working for WHM after testing positive for drugs." We address the circumstances surrounding each alleged comparable person in turn.

First, Tony Davis, a white male, was a "superintendent" or "supervisor" whereas Rincones was a catalyst technician. Rincones's primary job responsibilities were cleaning large reactor tanks at the refinery and operating a forklift to move large sacks containing catalyst pellets. Rincones testified Davis was three ranks above him. Further, WHM produced evidence that Davis never failed a drug test for WHM and Rincones has no evidence to the contrary. Davis is not similarly situated to Rincones as a matter of law. *See Reyes*, 272 S.W.3d at 594.

Second, Mark Sweet, also a white male, was even higher ranking than Davis. According to Rincones, Sweet was "the operations manager . . . the big guy, the big man." Like Davis, Sweet cannot be similarly situated to Rincones. *See id.*

Third, Darren Cooper, a black male, indeed held the same position as Rincones. And Cooper was also put on inactive status following a DISA drug test. Rincones contends that a WHM human-resources manager assisted Cooper in rehabilitating after his drug test, but the manager provided no assistance or counseling to Rincones other than telling Rincones he had to "work it out" with DISA. Yet the record shows that the same manager told Cooper, like he told Rincones, to call DISA and

---

[4] There is discussion of a fourth alleged comparator in Rincones's briefing to this Court and in the record. But Rincones waived reliance on that person because his response to WHM's traditional and no-evidence summary judgment motion explicitly offered only three comparators: Davis, Sweet, and Cooper. Therefore, Rincones failed to "fairly apprise" the trial court of the issue of the fourth alleged comparator and we limit our analysis to the three alleged comparators that Rincones identified. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) ("The written answer or response to [a summary-judgment] motion must fairly apprise the movant and the court of the issues the non-movant contends should defeat the motion."); *State Bd. of Ins. v. Westland Film Indus.*, 705 S.W.2d 695, 696 (Tex. 1986) (per curiam) ("[I]ssues not expressly presented to the trial court may not be considered on appeal as grounds for reversal of a summary judgment.").

get his status cleared up. The difference is that Cooper chose to go through rehabilitation. Because he did so successfully, Cooper was able to regain active DISA status and return to work. Rincones's bald allegations aside, no evidence shows he was denied the opportunity to rehabilitate under the terms of the Substance Abuse Program. The "situations and conduct of employees is not nearly identical 'when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.'" *Id.* at 594 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)). That is precisely the case here. As a matter of law, Rincones and Cooper are not similarly situated.

Rincones offered no proof, not even circumstantial evidence, of even one similarly situated person who was treated differently. No evidence demonstrates that any employee was allowed to submit a different sample to overturn his inactive status, or that any employee was allowed to work with an inactive status. Although Rincones's burden was not onerous, he nevertheless failed to establish his prima facie case. We reverse and render judgment for WHM.

**C. Retaliation**

"An employer . . . commits an unlawful employment practice if the employer . . . retaliates or discriminates against a person who, under this chapter: (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE § 21.055. Opposing a discriminatory practice includes making an internal grievance. *Lopez*, 259 S.W.3d at 151. A plaintiff must prove "(1) [he] engaged in an activity protected by the [Texas Commission on Human Rights Act][;] (2) an adverse employment action occurred[;] and (3) there exists a causal link between the protected

16

activity and the adverse action." *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015).

Rincones offers only one piece of evidence on this point: his own deposition testimony in which he claimed he called a WHM human-resources director and "told him how come Tony Davis [a white employee] was still working and I couldn't. And he didn't explain to me why." He claims to have made a similar statement to another WHM employee. On that basis, the court of appeals held "Rincones communicated to WHM that he believed he was being treated differently and less favorably [from] other employees, who WHM knew were non-Hispanic employees . . . . Although Rincones may not have used the magic words 'race or national origin' when making his complaint, that does not necessarily mean that the activity he engaged in was not protected." 457 S.W.3d at 241. This, the court said, raises a fact issue about whether he engaged in a protected activity by opposing a discriminatory practice.

Federal courts do not require "magic words," but those same courts also say "protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam). Rincones's statement about Davis is not sufficient to have alerted WHM to alleged discrimination. Further, Rincones admitted in his deposition he did not complain about race or other discrimination to anyone at WHM, or that he was not allowed to return to work because of his race or national origin.

Rincones did not engage in an activity protected by the Texas Commission on Human Rights Act because his only evidence on this claim—his statement about Tony Davis—does not amount

to opposition to a discriminatory practice. With no protected activity, there can be no retaliation. We therefore render judgment for WHM.

### D. Pattern-or-Practice Discrimination

The trial court dismissed Rincones's pattern-or-practice discrimination claim against WHM for lack of subject-matter jurisdiction because it fell outside the scope of his underlying administrative charge of discrimination. The court of appeals reversed. It held "Rincones' claim for pattern[-]or[-]practice discrimination is factually related to his claim for discrimination based on race and national origin" and held the trial court had jurisdiction. 457 S.W.3d at 244.

Before this Court, however, Rincones explicitly abandoned this issue and stated that he will not pursue this claim if the case is remanded. Rincones's counsel informed this Court, in a motion filed July 4, 2016, that: "Rincones addressed all dispositive motions granted by the trial court made the basis of the appeal except the 'pattern and practice' claim which he is abandoning and will not be seeking in the trial court in the event this case is remanded." Rincones does not discuss this issue in his brief on the merits.

"A case becomes moot if a controversy ceases to exist between the parties at any stage of the legal proceedings, including the appeal." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005). Because there is no longer any controversy between WHM and Rincones on this claim, it is moot. Therefore, without addressing the merits of the court of appeals' analysis or WHM's arguments, we vacate the court of appeals' judgment as to this claim. *See Houston Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 157 (Tex. 2007); *Marshall v. Hous. Auth. of City of San Antonio*, 198 S.W.3d 782, 785 (Tex. 2006).

18

### III. Claims against Exxon

Exxon argues that the court of appeals erred by reviving one claim the trial court dismissed for want of jurisdiction and two claims upon which the trial court granted summary judgment for Exxon. For the reasons discussed below, we agree and render judgment for Exxon.

As an initial matter, Rincones also alleges errors in the court of appeals' handling of his claims against Exxon. In addition to the claims appealed here by Exxon, Rincones had sued Exxon for individual discrimination, retaliation, and defamation. The trial court granted Exxon's no-evidence and traditional summary-judgment motions on these claims. The court of appeals affirmed the trial court's dismissal based on Rincones's failure to challenge all of the grounds raised in Exxon's summary-judgment motions. 457 S.W.3d at 249–50.

Rincones now complains to us that the trial court "erred when it granted Exxon's no[-]evidence motion on March 23, 2010" and "erred again when it purportedly granted Exxon's traditional summary judgment on November 16, 2010[,] regarding the same claims, without considering the evidence Rincones submitted in his response to the no[-]evidence motion." Rincones is, however, the respondent in this Court and did not cross-petition. "A party who seeks to alter the court of appeals' judgment must file a petition for review." TEX. R. APP. P. 53.1. That is, an issue raised for the first time in a respondent's brief on the merits is waived in the absence of a petition for review. *See McGinty v. Hennen*, 372 S.W.3d 625, 626 n.1 (Tex. 2012) (per curiam). Because they are not properly before us, we do not consider Rincones's allegations of error.

## A. Pattern-or-Practice Discrimination

Exxon argues the trial court properly dismissed Rincones's pattern-or-practice discrimination claim because it fell outside the scope of his underlying administrative charge of discrimination. The court of appeals reversed the trial court and reinstated the claim, holding it was factually related to his race-and-national-origin discrimination claim. 457 S.W.3d at 244, 249.

Rincones's counsel expressly abandoned this claim against Exxon at oral argument and in a motion filed with this Court.[5] Like his pattern-or-practice discrimination claim against WHM, this issue is moot. We need not address the merits of Exxon's argument. We vacate the court of appeals' judgment as to this claim. *See Ferrell*, 248 S.W.3d at 157; *Marshall*, 198 S.W.3d at 785.

## B. Tortious Interference with an Employment Contract

The trial court granted Exxon's traditional and no-evidence motions for summary judgment on Rincones's tortious-interference claim. The court of appeals reversed, holding a genuine issue of material fact existed as to whether Exxon interfered with Rincones's employment contract with WHM. *Id.* at 221, 253. The only evidence on which the court of appeals relied was a one-page letter sent from Exxon to WHM in January 2009. *Id*.

The letter reads in relevant part:

It has recently come to the attention of [Exxon's] Baytown Facility that [WHM] has failed to comply with the requirements set forth in [the Exxon—WHM Agreement] at Exhibit H "Contractor Drug, Alcohol and Contraband Requirements." The WHM employee in question is Gilberto Rincones.

---

[5] JUSTICE WILLETT: "Counsel for Exxon says you've expressly disavowed the discrimination claim."

COUNSEL FOR RESPONDENT: "I'm not making a discrimination claim against Exxon, that's correct. . . ."

> Exhibit H requires that a contractor notify [Exxon] when an individual working on [Exxon] property becomes disqualified. . . . Please ensure that the appropriate person within your company completes Exhibit H and submits it to [Exxon] immediately. In addition, please ensure that all those involved in this process understand the requirements so that this non-compliance is not repeated.

A claim for tortious interference with a contract consists of four elements: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred. *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). A defendant may defeat a tortious-interference claim on summary judgment by disproving at least one element of the claim as a matter of law. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam).

Exxon argues that Rincones offered no evidence of interference or causation. Rincones contends Exxon sent the January 2009 letter to ensure he would no longer work at the Baytown refinery. He further claims a fact issue exists about when he was terminated.

The letter focuses exclusively on WHM's obligation to inform Exxon any time a WHM employee becomes inactive following drug or alcohol testing. The letter did not give any direction to WHM regarding Rincones's employment status. Nor did it say anything that could have interfered with the employment relationship between WHM and Rincones. Exxon was merely responding to WHM's failure to communicate as required by their contract. No reasonable juror could find that the letter interfered with Rincones's employment agreement with WHM. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam) (in reviewing summary judgment, appellate courts "must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented"). We hold no genuine issue of material

21

fact shows or establishes Exxon willfully and intentionally interfered with Rincones's employment contract. (And because no reasonable juror could conclude that the letter interfered with Rincones's employment agreement, we need not address when Rincones was actually terminated.)

Rincones also argues that Exxon can be liable for tortious interference through its agency relationship with WHM and DISA. Exxon argues that Rincones did not raise this argument in response to Exxon's summary-judgment motion on the tortious-interference claim and, because the issue was not presented to the trial court, it may not be considered on appeal to revive his claim here. *State Bd. of Ins. v. Westland Film Indus.*, 705 S.W.2d 695, 696 (Tex. 1986) (per curiam) ("[I]ssues not expressly presented to the trial court may not be considered on appeal as grounds for reversal of a summary judgment."). Rincones's discussion of this argument in his response to summary judgment is brief and not specific; he alleged that "Exxon and WHM empowered DISA . . . as agents to implement its [sic] drug[-]testing policy." Nevertheless, the allegation was sufficient to preserve the error for the court of appeals' review.

Although Rincones's agency argument was preserved, it still fails. As we explain below, no agency relationship existed. We reverse the court of appeals and render judgment for Exxon on this claim.

### C. Negligence

Rincones's negligence claim against Exxon depends on the existence of an agency relationship between Exxon and DISA. Exxon claims no evidence shows either that Exxon authorized DISA to act on its behalf or that Exxon had any right of control over DISA. Indeed, Exxon maintains that uncontroverted evidence establishes just the opposite. We agree that no

evidence demonstrates Exxon had a right to control DISA. Therefore, no evidence shows Exxon owed Rincones any duty. The court of appeals erred in reversing summary judgment on this point.

Generally, a business owner does not owe a duty for the negligence of an independent contractor. *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008). "But one who retains a right to control the contractor's work may be held liable for negligence in exercising that right." *Id.* Similarly, where a principal–agent relationship exists, a principal may be liable for an agent's or even a subagent's negligence under respondeat superior. *Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 276–77 (Tex. 2012).

Authority to act on the principal's behalf and control are the two essential elements of agency. *See Suzlon Energy Ltd. v. Trinity Structural Towers, Inc.*, 436 S.W.3d 835, 841 (Tex. App.—Dallas 2014, no pet.); *Reliant Energy Servs. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "[T]he key question is whether the principal has the right to control the agent with respect to the details of that conduct." *State Farm Mut. Auto Ins. Co. v. Traver*, 980 S.W.2d 625, 627 (Tex. 1998). Agency is not presumed; a party alleging the existence of an agency relationship bears the burden of proving it. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007) (per curiam).

The court of appeals reversed summary judgment on an agency theory, under which Exxon became DISA's "ultimate principal." 457 S.W.3d at 251–52. It agreed with Rincones that an agency relationship existed "between Exxon, WHM, and DISA with respect to the policies, practices, and procedures for drug and alcohol testing." *Id.* at 251. The court of appeals thus imposed on Exxon DISA's duty "to use reasonable care in performing the tests, reporting the results, and explaining

23

the return to work policies and procedures." *Id.* The court of appeals further imputed to Exxon DISA's alleged breaches regarding its handling and reporting of Rincones's drug test. *See id.*

Similarly, Rincones argues that it is clear "the [Substance Abuse Program] created, ratified and/or approved by Exxon, dictates ministerial acts which DISA must follow pursuant to the [program] and affords no discretion on how to perform those acts." He alleges a chain from Exxon to DISA: Exxon's contractual requirement that WHM follow the Substance Abuse Program's drug-testing, removal-from-jobsite, rehabilitation, and return-to-work protocols and procedures; the program's requirement that participating contractors use an approved third-party administrator, of which DISA is one of four; WHM's contract with DISA; and the program protocols controlling DISA's drug testing.

We disagree. Without dispute, there is no contract between Exxon and DISA. On the record here, WHM's contract with DISA to provide drug testing to WHM employees pre-dates WHM's contract with Exxon to provide labor. Ultimately, the question becomes: Did Exxon's contractual Substance Abuse Program requirements generate the requisite control over DISA to create an agency relationship? It did not.

The Substance Abuse Program, incorporated into Exxon's contract with WHM, required:

> Contractors that perform work on ExxonMobil facilities shall have and enforce a written policy (Contractor's Policy) on drugs, alcohol and other prohibited items that, at a minimum, meets the requirements outlined below. ExxonMobil Baytown Texas area facilities require Contractors to enroll and maintain an active status in the Houston Area Substance Abuse Program (HASAP) for all of their employees that may work on ExxonMobil Baytown property.

Rincones is correct to note that the Substance Abuse Program "contains detailed, specific, mandatory rules, policies and procedures which must be followed in order for WHM employees to

24

be eligible to work at Exxon's Baytown facilities." The program detailed the type of testing, protocols to use, procedures for negative test results, which employees are selected, and what levels of various substances constitute a positive test. Rincones contends "[t]here are no deviations or changes DISA can make to the [program] nor can it refuse to implement any of the specific and exacting tasks it is contractually obligated to perform pursuant to the WHM-DISA contract."

Yet Exxon did not develop the Substance Abuse Program. It was developed and promulgated by the Houston Business Roundtable, in which Exxon merely participates. Contrary to Rincones's assertion that Exxon specifically authorized WHM to contract with DISA, Exxon instead required WHM to select from Substance Abuse Program-certified providers. WHM could have chosen from among four providers, one of which was DISA. In fact, Exxon's contracts administrator at Baytown testified that she did not know WHM was using DISA as its third-party administrator until Rincones filed his discrimination charge.

Further, a "principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority." RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. f (2006). The Houston Business Roundtable, which is not alleged to be Exxon's agent, developed the Substance Abuse Program. The program in turn certifies third-party administrators. Under the contract here and the Substance Abuse Program, Exxon could not have unilaterally prevented WHM from using DISA as its third-party testing administrator.

The Substance Abuse Program, while detailed, does not amount to evidence of control sufficient to establish an agency relationship. Although performance standards prescribed by the

Substance Abuse Program were incorporated into the Exxon–WHM contract, DISA is an independent entity that controlled the day-to-day operations of its business. Specific implementation, such as whom to test on which day, was not within Exxon's control. Further, WHM had discretion to use a different provider altogether.

Without an agency relationship, Rincones cannot establish two key elements of his negligence claim: existence of a duty and breach of that duty. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995) (stating that plaintiff "must establish both the existence and the violation of a duty"). Because there is no evidence of a right to control, the trial court correctly granted summary judgment and the court of appeals erred in reversing it. We render judgment for Exxon on this issue.

### IV. Claims against DISA

On August 10, 2010, Rincones added DISA to this suit, asserting negligence and tortious interference with his employment contract with WHM.[6] DISA moved for summary judgment arguing that the two-year statute of limitations had run on Rincones's claims against it. DISA argued that the claims accrued on or immediately around April 14, 2008, the date Rincones was placed on inactive status and therefore lost the ability to earn wages from WHM. *See* TEX. CIV. PRAC. & REM. CODE § 16.003. Rincones argues DISA had an ongoing duty to counsel him regarding return-to-work policies and procedures. Every day DISA failed to counsel him, Rincones contends, DISA breached its duty anew. Under Rincones's reading, the date his causes of action against DISA accrued for limitations purposes is September 11, 2008. On that date the Texas Workforce

---

[6] Rincones also asserted other claims against DISA, but only the negligence and tortious-interference claims are before us in this appeal.

Commission issued its charge that Rincones had been effectively terminated and therefore lost his ability to regain active DISA status. We address the two appealed causes of action in turn, but note that some of Rincones's arguments are not clearly delineated between the two claims. We consider his arguments on these points broadly, and the organization of our analysis below should not be read as strictly limiting any imprecise arguments to one claim or the other.

### A. Tortious Interference

The court of appeals agreed with Rincones and held his tortious-interference claim was not time-barred. It relied on *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989), to conclude that in claims for tortious interference with contract "the injury occurs when the interference causes actual damage or loss by impairing performance of the contract or causing its termination." 457 S.W.3d at 253. Thus, the court said, "Rincones's cause of action against DISA accrued on September 11, 2008[,] because that is when the alleged interference caused actual damage or loss." *Id.*

We cannot agree with the court's conclusion that Rincones's cause of action did not accrue until after a third party declared Rincones's employment terminated. The statute of limitations runs from the time the cause of action accrues. TEX. CIV. PRAC. & REM. CODE § 16.003(a). We have consistently stated that "a cause of action generally accrues at the time when facts come into existence which authorize a claimant to seek a judicial remedy" and the "fact that damage may continue to occur for an extended period after denial does not prevent limitations from starting to run." *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990).

27

Applying our well-settled precedent to this cause, we hold that a claim for tortious interference with a contract accrues at the time a contracting party knows the nature of the injury and the damages, regardless of whether the contract is terminated at that time. *See id*. In holding otherwise, the court of appeals' reliance on *Sterner* was misplaced. In that case we decided whether a cause of action existed for tortious interference with a terminable-at-will employment contract, but did not discuss how the statute of limitations affects such a claim. *See Sterner*, 767 S.W.2d at 688. We held the contract, until terminated, "is valid and subsisting, and third parties are not free to tortiously interfere with it." *Id.* at 689. The court of appeals relied on that holding to support its conclusion that an "injury occurs when the interference causes actual damage or loss by impairing performance of the contract or causing its termination." 457 S.W.3d at 253. But the court erred in construing *Sterner* as an exception or modification to our when-facts-come-into-existence rule. *See Murray*, 800 S.W.2d at 828.

Facts came into existence authorizing Rincones to seek a judicial remedy on April 14, 2008, the day he was informed of his failed drug test and inactive status. On that day, he knew of the negative effects his inactive status would have on his job: he would no longer receive income or assignments from WHM unless he followed procedures to regain active status. Rincones's tortious-interference claim is barred because he did not bring it until more than two years after the accrual date, April 14, 2008. TEX. CIV. PRAC. & REM. CODE § 16.003(a). Even if he may have continued to suffer damages after that date, his claim is time-barred as a matter of law. The court of appeals erred by holding otherwise. We reverse and render judgment for DISA on this claim.

28

**B. Negligence**

DISA also argues that Rincones's negligence claim is time-barred. It challenges the court of appeals' holdings about when Rincones's causes of action accrued and who bore what burdens in deciding the statute-of-limitations issue at summary judgment.

Rincones's cause of action for negligence against DISA was filed and served in August 2010. In the trial court, DISA moved for summary judgment based on the two-year statute of limitations for negligence. TEX. CIV. PRAC. & REM. CODE § 16.003(a). As with his tortious-interference claim, Rincones argued in response that his negligence claim did not accrue until September 2008.

DISA argues that the court of appeals erred by holding DISA was not entitled to summary judgment because it failed to negate Rincones's theories of continuing-tort doctrine and equitable estoppel, raised for the first time in his response to DISA's summary-judgment motion. 457 S.W.3d at 254. The court held the issues were tried by consent and DISA could not object to them for the first time on appeal. We disagree.

**1. The Continuing-Tort Doctrine**

First, we hold that the continuing-tort doctrine is inapplicable to Rincones's claim as a matter of law. "A continuing tort involves wrongful conduct inflicted over a period of time that is repeated until desisted, and each day creates a separate cause of action." *First Gen. Realty Corp. v. Md. Cas. Co.*, 981 S.W.2d 495, 501 (Tex. App.—Austin 1998, pet. denied). A claim for a continuing tort does not accrue until the defendant's wrongful conduct ceases. *Id.* The doctrine of continuing tort, with its extension of accrual date, is rooted in a plaintiff's inability to know that the ongoing conduct is

causing him injury. *See Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542 (Tex. App.—Dallas 1994, writ denied).

We have "neither endorsed nor addressed" the continuing-tort doctrine. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 924 (Tex. 2013). But the Waco, Dallas, and Austin Courts of Appeals have. Those courts applied the doctrine in cases of false imprisonment, negligent infliction of emotional distress, and continued use of injury-producing medicine, acknowledging continuing torts in each of these situations. *See Adler v. Beverly Hills Hosp.*, 594 S.W.2d 153, 155 (Tex. App.—Dallas 1980, no writ) (false imprisonment); *Twyman v. Twyman*, 790 S.W.2d 819, 821 (Tex. App.—Austin 1990), *rev'd on other grounds*, 855 S.W.2d 619 (Tex. 1993) (negligent infliction of emotional distress); *Upjohn*, 885 S.W.2d at 542 (continued use of injury-producing medicine). By contrast, the Waco court has determined that trespass by placing cable lines on an owner's property is a single act causing a continuing injury and, therefore, is not a continuing tort. *See Krohn v. Marcus Cable Assocs., L.P.*, 201 S.W.3d 876, 881 (Tex. App.—Waco 2006, pet. denied).

We recognize that the continuing-tort doctrine might provide needed protections to plaintiffs in certain situations. But it does not apply here. We follow our rule that "a cause of action generally accrues at the time when facts come into existence which authorize a claimant to seek a judicial remedy" and the "fact that damage may continue to occur for an extended period after accrual does not prevent limitations from starting to run." *Murray*, 800 S.W.2d at 828. Assuming, without deciding, that actual damage or loss occurred here, those damages resulted from a single act on April 14, 2008. The statute of limitations expired two years from that date.

**2. Equitable Estoppel**

Rincones argues that even if limitations began to run in April 2008, DISA should be equitably estopped from asserting a statute-of-limitations defense. He claims that he sued the wrong defendant on February 23, 2010—before limitations had run—but was not aware of the mistake because DISA's agent indicated DISA was aware of the suit and would file an answer, rendering service necessary. On this sub-issue, the court of appeals found that "DISA had the burden of negating . . . equitable estoppel to establish its entitlement to judgment as a matter of law based on its limitations defense" and concluded that "[t]here is no dispute that DISA failed to meet this burden." 457 S.W.3d at 254.

DISA argues that the court of appeals impermissibly shifted the burden of proof by stating that DISA failed to present any contradicting evidence and then failed to examine whether Rincones met his burden to present sufficient evidence on each element of his defense. We agree that the court of appeals erred in its assignment of burdens of proof on the equitable-estoppel issue.

"A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense." *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). Yet even when conclusively established, a plaintiff may invoke equitable estoppel as an affirmative defense in avoidance of a defendant's limitations defense. *See Oram v. Gen. Am. Oil Co. of Tex.*, 513 S.W.2d 533, 534 (Tex. 1974) (per curiam). In that situation, the non-moving plaintiff bears the burden of establishing its defense. Once the movant establishes that the action is barred, the non-movant must present summary-judgment evidence raising a fact issue on each element of his affirmative defense in avoidance. *See KPMG Peat*

31

*Marwick*, 988 S.W.2d at 748–50; *Zale Corp. v. Rosenbaum*, 520 S.W.2d 889, 891 (Tex. 1975) (per curiam); *Nichols v. Smith*, 507 S.W.2d 518, 521 (Tex. 1974). The movant has no burden to negate the non-movant's affirmative defense in avoidance.

Therefore, once DISA conclusively established that Rincones's negligence claim accrued in April 2008, the burden shifted to Rincones to produce summary-judgment evidence sufficient to raise a fact issue on each element of his affirmative defense in avoidance. The elements of his estoppel defense are: (1) DISA made a false representation or concealed material facts; (2) with actual or constructive knowledge of those facts; (3) with the intent that Rincones act on DISA's representation; (4) to Rincones, who had no knowledge or the means of knowledge of the facts; and (5) Rincones detrimentally relied on the representations. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998).

To that end, Rincones argued DISA's alleged agent, Robynn Brown, induced him by her representations to delay filing suit until after limitations had run. But Rincones did not carry his burden in several regards. The summary-judgment record is devoid of evidence that DISA made a misrepresentation of material fact. And, as discussed below, there is conclusive evidence Rincones had knowledge about DISA well before limitations ran. Rincones failed to produce summary-judgment evidence to create a fact issue on each element of his defense in avoidance of limitations. His burden was to do so and the court of appeals erred by requiring DISA to negate Rincones's equitable-estoppel defense.

### 3. Misnomer

Finally, Rincones further attempts to avoid limitations by claiming misnomer, misidentification, and due diligence in identifying and suing DISA. This issue was raised and extensively argued in the trial court, but was not addressed by the court of appeals.

"A misnomer differs from a misidentification." *In re Greater Houston Orthopaedic Specialists, Inc.*, 295 S.W.3d 323, 325 (Tex. 2009) (per curiam) (citing *Enserch Corp. v. Parker*, 794 S.W.2d 2, 4 (Tex. 1990)). "Misidentification—the consequences of which are generally harsh—arises when two separate legal entities exist and a plaintiff mistakenly sues an entity with a name similar to that of the correct entity." *Id.* (citing *Chilkewitz v. Hyson*, 22 S.W.3d 825, 828 (Tex. 1999)). If a "plaintiff is mistaken as to which of two defendants is the correct one and there is actually existing a corporation with the name of the erroneously named defendant (misidentification), then the plaintiff has sued the wrong party and limitations is not tolled." *Enserch*, 794 S.W.2d at 5. In contrast, a "misnomer occurs when a party misnames itself or another party, but the correct parties are involved." *In re Greater Houston Orthopaedic Specialists*, 295 S.W.3d at 325. The courts of this state generally allow parties to correct a misnomer if it is not misleading. *Id.*

Despite Rincones's contrary contentions, the record leads us to view this case as one of misidentification. In his original, first-amended, and second-amended petitions, Rincones named "Dallas Mentor, Inc., f/k/a Turn Around Incorporated" as a defendant. In February 2010, Rincones filed a third-amended petition, which named a new defendant: "DICA, Inc., a/k/a Marcelo Investments, Inc." Rincones contends that "DICA" was merely a typo for the DISA, which was correctly named in his live, fourth-amended petition on August 10, 2010. Yet Rincones's attorney

acknowledged in an affidavit to the trial court that "DISA, INC., a/k/a Marcelo Investments, Inc.," was "not the proper party who was the [third-party administrator] in this case." Rincones's live, fourth-amended petition contains no reference to "Marcelo Investments."

Indeed, conclusive evidence shows Rincones knew about DISA well before limitations ran. For example, DISA is referred to dozens of times in Rincones's own deposition taken on November 10, 2009—nearly a year before Rincones filed the amended petition that first correctly named DISA as a defendant. Many of those references to DISA were made by Rincones's attorney. Rincones's failure to name DISA as a party before the statute of limitations expired cannot be excused. (Accordingly, we need not address Rincones's argument that he diligently attempted to serve DISA.) The trial court was correct to grant summary judgment as a matter of law.

Rincones's negligence claim, like his tortious-interference claim, is time-barred because limitations began to run when he first suffered an injury in April 2008. The continuing-tort doctrine and the other arguments Rincones advances do not change that conclusion. We reverse the court of appeals and render judgment for DISA.

* * *

The trial court correctly granted summary judgment for Exxon, WHM, and DISA. For the reasons stated above, we reverse the court of appeals in part, vacate in part, and render judgment reinstating the trial court's final take-nothing judgment against Rincones.

34

_____

Jeffrey V. Brown
Justice


OPINION DELIVERED: May 26, 2017