**AFFIRMED and Opinion Filed July 28, 2021**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-19-01223-CV**

**MARIA RUTH LIMAS, Appellant**
**V.**
**CITY OF DALLAS, Appellee**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-16334**

## MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Partida-Kipness
Opinion by Justice Osborne

Appellant Maria Ruth Limas was employed by appellee City of Dallas for over twenty years. In the year leading up to her termination, the City transferred Limas to a new department, and the City's Department of Human Resources subsequently conducted two investigations into several incidents wherein Limas allegedly had conflicts with several coworkers. After human resources determined that Limas had violated several of the City's Personnel Rules in connection with the incidents, the City suspended Limas and warned her that future occurrences of such nature could be grounds for discharge. Within days after her return, however, Limas

allegedly had another conflict with a coworker; the City terminated her roughly two weeks later.

Limas then sued the City, asserting she had been subject to discrimination, harassment, hostile environment, and retaliation because of her race (Hispanic) in the new department where many of the other employees were African American. The City filed a plea to the jurisdiction with evidence and requested dismissal of Limas's claims on the basis of governmental immunity from suit. The trial court granted the City's plea and dismissed all of Limas's claims with prejudice. In three issues, Limas argues the trial court erred by dismissing her claims for race discrimination, retaliation, and hostile work environment and harassment because disputed questions of material fact exist that should be decided by a jury. We affirm.

## FACTUAL BACKGROUND[1]

### A. Limas's Position in Accounts Payable

Limas worked for the City for over twenty years. In November 2017, the City transferred Limas, who is Hispanic, to a position as a Senior Office Assistant in the Accounts Payable Division (Accounts Payable) of the City's Controller's Office (CCO) from the same position in another department.

Accounts Payable was housed in a cramped room filled with multiple cubicles. Simonne Haas, who is Caucasian, was the Accounts Payable manager.

---

[1] The facts recited herein are reflected in the evidence filed by the parties regarding the City's plea to the jurisdiction, viewed in the light the most favorable to Limas.

–2–

Under manager Haas were three supervisors, all of whom were African American: Carla Hill, Dalton Green, and Shawntaye Rand. Limas reported to supervisor Hill.

The City suspended and later terminated Limas in July and August 2018, respectively. Before Limas's suspension, the City's Department of Human Resources (HR) conducted two investigations into several incidents involving Limas and various coworkers, discussed below.

**B.     HR's First Investigation**

HR's first investigation concerned an incident in February 2018 between Limas and Jamie Hughes, an Office Assistant in Accounts Payable who is African American. HR took statements from ten people. HR summarized the statements, its conclusions, and its recommendations in a report dated in June 2018.

Limas generally described the incident as follows: A strong smell in the Accounts Payable office was making her sick and cough, so she opened the back office doors. When Hughes was in another coworker's office, Limas mentioned that she had opened the doors to ventilate the smell. Hughes then said, "Oh so you opened the doors," "I don't care what you say woman," and that he was going to close the doors. While Limas had her hands on the doors, Hughes "forced and closed the glass door[s]." Limas claimed that Hughes raised his voice at her, came behind her, put his hands on her hands to move her out of the way, and forced the glass doors closed.

In response to a question on an HR questionnaire asking Limas if she wanted to add anything about the incident, she responded, "It was not a good feeling in the incident."

Hughes, however, reported the following: He questioned why the back doors were open because the doors were supposed to remain closed. He acknowledged to Limas her concerns about the smell, reminded her that they could not keep the doors open, and asked Limas to agree to keep the doors open for fifteen to twenty minutes. Limas agreed. When noise in the hallway got loud, however, Hughes closed the doors. Limas then told Hughes that he had no right to close the doors. When Limas opened the doors again, Hughes closed them back. This continued until management returned to the office.

According to HR's report, supervisor Green stated he intervened in the situation between Limas and Hughes. He reported that after he intervened, (1) Limas told him that Hughes "was harassing her" and that Hughes had "tried to slam her finger in the office door," and (2) Hughes told him that he had shut the doors because their office was a secure area and management had instructed them to keep the doors closed. All witnesses—except Limas—described Limas as having raised her voice; some witnesses stated Limas had yelled or screamed, and some stated Limas had touched Hughes while she tried to move him out of her way. Multiple witnesses reported that Hughes had held the doors shut and had told Limas they had to keep the doors closed. No witness other than Limas reported Hughes touching Limas.

Manager Haas reported that after this incident, "several employees [were] now scared to speak to or even look at [Limas] due to what they observed during this incident."

HR concluded that Limas violated the City's Personnel Rules and caused a disturbance in the workplace. It further concluded that Hughes, though complying with instructions to keep the office doors closed, "responded to the situation in an unprofessional manner"; HR also concluded, however, that "his behavior did not rise to the same level as Ms. Limas'[s] behavior." HR recommend that the CCO discipline Limas, counsel Hughes, and provide them both with conflict-resolution training.

## C.    HR's Second Investigation

HR's second investigation concerned three incidents on the same day in April 2018. HR took statements from nine individuals and prepared a report dated in June 2018, summarizing the statements, its conclusions, and its recommendations concerning these incidents.

### 1.    Alleged Miranda copy-room-attack incident

The first incident involved Cassandra Miranda, a temporary employee who is Hispanic. In her written statement, Limas alleged that Miranda came out of a copy room quickly, "intentionally bumped hard into" Limas, and left a swollen scratch on Limas's arm.

Miranda, however, claimed the following: Miranda was walking away from the printer area when she and Limas did not see each other coming, and they accidentally bumped into each other. Limas then pushed Miranda, gave her a dirty look, and walked off. Miranda was shocked and asked Limas, "Did you just push me?" Limas later approached Miranda and told her that she had scratched her, and Miranda responded, "you pushed me." Limas then told Miranda not to yell at her, and then Miranda said, "Oh hell no," and reported the issue to supervisor Green. According to HR's report, Miranda stated that in their meeting with supervisor Green, Limas's "version of what [had] occurred kept changing," and Limas accused Miranda of bumping into her on purpose.

Miranda, who also later overheard the last incident involving Limas that day, further reported that she felt uncomfortable with Limas around, had to tiptoe everywhere she went, and had to make sure Limas was not around. Miranda believed Limas would lie and say Miranda did something that she did not do.

According to HR's report, Juanita Garza, an Office Assistant who is Hispanic, witnessed this incident. Garza also reported that Miranda and Limas "accidentally bump[ed] into each other"; Limas then "push[ed] Ms. Miranda off"; Miranda "looked confused and shocked" and asked Limas, "Did you just push me?"; and Limas just responded, "what," and walked to her office.

## 2. Alleged Britt hall-purse-attack incident

The second incident involved ShaToya Britt, an Office Assistant in Accounts Payable who is African American. In her written statement, Limas alleged the following: She was walking down an office pathway when Hughes and Britt "came out from the middle cubicle offices and saw [Limas] already coming." Hughes passed without incident. But when Britt passed "next to [Limas while] carrying her bags on her left hand, [on] the same side [that Limas] was coming by[,] . . . [Britt] intentionally bumped [Limas] with her bags[,] which hit [Limas] on [her] stomach, making [Limas] feel suffocated."

In a questionnaire, HR asked Limas whether she believed Britt had intentionally bumped into her and, if so, to describe why she believed this. Limas answered, "Yes, I believe Ms. Britt bumped into me intentionally. I do not know her reason."

Britt, however, claimed that when she turned a corner, the purse and bag that she was carrying on her left arm swung out and accidentally bumped into Limas. She alleged that she apologized to Limas but that Limas "went off" and said, "[S]o you're going to just bump into me and hit me too."

According to HR's report, Hughes and supervisors Green, Hill, and Rand each witnessed portions of the incident between Limas and Britt. Hughes reported that Britt accidentally bumped into Limas with her purse when she turned a corner, that Britt immediately said "excuse me" to Limas, but that Limas said Britt had done it

on purpose and was picking on her. Supervisors Green, Hill, and Rand all reported that they overhead Limas accusing Britt of hitting her on purpose; supervisor Rand also stated she had overheard Limas telling Britt to "pick on someone her height."

### 3. Alleged supervisor Green yelling incident

The third incident involved supervisor Green. In her written statement to HR, Limas alleged the following: She went to supervisor Hill's office and "inform[ed] her . . . [that] Britt had just bumped [her] with her bags." But "before [supervisor Hill] could say something, . . . [supervisor] Green said[,] 'Oh Ruth, now you are saying [Britt] bumped on you.[']" Limas responded, "[Y]es[,] she had just bumped me making me feel suffocated . . . ." "Green [then] got very loud and boisterous saying at [her,] 'Oh so now you are [cussing] and calling me the "F" word[,]' and [Limas] said[,] 'No[] I am not. I am saying, she just suffocated me with her bags.'" Supervisor Green yelled at Limas; continued to be "loud and boisterous"; and said, "you are [cussing] at me and I am the supervisor," and "I am calling . . . security on you to escort you out of this office."

In response to a question on HR's questionnaire asking Limas if there was anything she would like to add, Limas responded, "NA."

Supervisor Green, however, reported the following: He got up to assist supervisor Hill in calming Limas down after the incident with Britt. He told Limas that he did not think that Britt had run into her on purpose, but Limas insisted that Britt had and began "scream[ing] at the top of her lungs: '[N]o, don't do me like

–8–

that. She fucking [suffocated] me.'" He told Limas that her behavior was unacceptable and that she needed to leave the office, and Hill called security.

According to HR's report, Miranda and supervisors Rand and Hill each witnessed portions of this incident. Supervisor Hill reported that as she was speaking to Limas at her desk, Britt walked by, and Limas accused Britt of bumping into and hitting her. She instructed Limas not to say anything more to Britt and to get her belongings and leave for the day. Supervisor Green then repeated these instructions. All three witnesses reported that Limas had yelled or screamed and used profanity at Green. Supervisor Rand also reported that Limas had said that Britt had "fucking [suffocated] me," and Miranda reported that Limas had used the word "fuck." Supervisor Hill reported that supervisor Green and Limas had argued and yelled and that she called security; supervisor Rand and Miranda, however, stated that supervisor Green had spoken sternly or had raised his voice but had not yelled.

HR's report indicates that the security officer who arrived stated that he could overhear Limas yelling profanity at supervisor Green when he arrived. Limas told the officer that "she had been bumped into by a fellow employee" and that "other employees had harassed her on different occasions." When the officer advised Limas that she was free to leave, she refused to leave and insisted on going to HR; the officer then escorted Limas to HR.

HR concluded that Limas violated the City's Personnel Rules, finding that she had caused a disturbance in the workplace, had been insubordinate to CCO

Management, and had been discourteous to other employees. HR further concluded that there was insufficient evidence to support a finding that (1) Miranda or Britt had intentionally bumped into Limas or that (2) Miranda, Britt, or supervisor Green had harassed Limas. HR again recommended that the CCO discipline Limas.

## D. Grievance Against Supervisor Rand for Alleged Chair-Slamming Incident

In late July 2018, after HR's two investigations had concluded, Limas filed a grievance against supervisor Rand. In an "Employee Grievance" form, Limas alleged the following: Limas "was working in [her] office and . . . [supervisor] Rand[] hit very hard on [Limas's] office wall cubicle with a chair in front of [her], the direction [Limas] was facing [while] working on the computer." Limas claimed that the incident "affected [her] job focus and working environment atmosphere causing emotional distress of the very loud disruptive noise that . . . [supervisor] Rand[] hit very hard on [her] office wall cubicle." Limas stated that she sought "[s]afety and unnecessary disruption of the work area and that . . . [supervisor] Rand . . . ask for help to move a chair when unable to move the chair safely herself to avoid hitting anything or anyone." Limas met with a human resource analyst about the grievance and also complained to manager Haas.

## E. Limas's Suspension

Later in July 2018, manager Haas reviewed HR's two investigative reports and, based on those reports, suspended Limas for five days, effective July 31, 2018. Manager Haas did not suspend any other Accounts Payable employees based on

either investigation because, according to manager Haas, the investigations indicated that the conduct of the other employees was not comparable to Limas's conduct.

In the notice-of-suspension letter, manager Haas informed Limas that she had violated Sections 34-36(b)(5)(E), (10)(A), and (12)(A), (D), (E), (F), and (H) of the City's Personnel Rules[2] by yelling or screaming, causing a disruption, pushing coworkers, using profanity, instigating arguments with coworkers, and refusing to leave the office when instructed. Manager Haas warned Limas that "[f]uture occurrences of this nature will not be tolerated and may be cause for additional disciplinary measures, up to and including discharge."

Limas testified at her deposition that her suspension was based on HR's two investigations and resulting conclusions.

_____

[2] The below quotation from Haas's suspension letter identified the Personnel Rules violated:

> Section 34-36(b) <u>Unacceptable conduct</u>. The following types of conduct are unacceptable and may be cause for corrective discipline in the form of reprimand, suspension, demotion, or discharge depending upon the facts and circumstance of each case. . . .
> (5)    <u>Indifference towards work</u> is exemplified by, but is not limited to, the following violations:
>     (E)    discourteous or irresponsible treatment of the public or other employees.
> (10)    <u>Insubordination</u> is exemplified by, but is not limited to, the following violations:
>     (A)    willful failure or refusal to follow the specific orders or instructions of a supervisor or higher authority; . . .
> (12)    <u>Disturbance</u> is exemplified by, but is not limited to, the following violations:
>     (A)    fighting or boisterous conduct;
>     (D)    unnecessary disruption of the work area;
>     (E)    use of profane, obscene, abusive, threatening, or loud and boisterous language;
>     (F)    harassment or workplace violence as defined in the administrative directives of the city;
>     (H)    other disruption of the harmonious relations among employees or between employees and the public[.]

**F.     Alleged Brown Toe-Kicking Incident**

Limas returned from her suspension on August 7, 2018. On August 10, 2018, Limas submitted a written complaint to supervisor Hill against Linda Brown, a temporary worker who is African American. In her complaint, Limas alleged the following: She "stepped out of the office and when [she] turned to the left around the corner hallway, . . . Brown was coming but . . . [was] looking to the side and . . . hit/kicked [Limas] on [Limas's] right foot toe. [Limas's] right foot toe hurt[] very much and got red and swollen."

Brown, in turn, gave supervisor Hill a handwritten statement titled, "Accident Today." Brown alleged the following: She was coming from the restroom and, upon reaching the corner to turn, she and Limas "collided at the corner of the wall by accident." She told Limas that she was sorry and asked Limas if she was okay, but Limas "looked at [her] and said[,] 'No I'm not okay. You hurt my toe[,] and I'm going to have to report it.'" Brown told Limas again that she was sorry, that it was an accident, and that she did not see her; but Limas walked back to the department and "told another young lady what [had] happened." Limas then again accused Brown of kicking her toe and said she was going to report it.

A few days later, Brown provided a revised, typed statement to supervisor Hill that did not contain the heading, "Accident Today." The typed statement was substantially the same as her handwritten statement but added that (1) when they

–12–

went back to the department, Limas "told Arlene Cisneros" what had happened and (2) "Yolonda" asked Brown if she was okay.

Supervisor Hill gave the women's statements to manager Haas.

## G.     Alleged Hill Shoulder-Touching Incident

At her deposition, Limas described an additional incident involving supervisor Hill; the record contains no information about when this incident occurred. Limas testified that supervisor Hill had approached her, pointed at her, and touched her shoulder. She further testified that supervisor Hill (not Limas) reported the incident to Rita Wright, a Human Resources Analyst in HR.

## H.     Limas's Termination

Roughly two weeks after the Brown incident, and after consulting with Wright, manager Haas terminated Limas. Manager Haas testified by affidavit that she had concluded that termination was the appropriate level of discipline based on Limas's repeated violations of the Personnel Rules. She further explained that in less than a year, Limas had accused several co-workers of harassing and/or physically accosting her; yet, HR's investigations into these incidents "concluded that, not only could Ms. Limas's allegations against her co-workers not be substantiated, but that Ms. Limas, rather than her co-workers, was the aggressor."

The City replaced Limas with a man who is Hispanic.

## I.    Hughes's Suspension

Unrelated to any incident involving Limas, but relevant to this appeal, is an investigation HR conducted in 2018 relating to Hughes. Specifically, HR investigated whether Hughes had sexually harassed a temporary employee (M.C.) (the Hughes Investigation). In a report dated in early July 2018, HR concluded that there was (1) "insufficient evidence to support a finding . . . [that] Hughes [had] sexually harassed" M.C. but (2) sufficient evidence to support a finding that he had violated the Personnel Rules by asking M.C. for a hug in an email, telling M.C. that he thought he was better looking than her husband, and telling various employees on multiple occasions that he was better looking than their boyfriends. HR further determined that both Hughes and M.C. had used profanity in an email exchange. HR recommended disciplinary action against Hughes and counseling on proper email communication for both Hughes and M.C.

Manager Haas testified that after reviewing HR's report concerning the Hughes Investigation and consulting with Wright, she issued Hughes a five-day suspension, effective on July 31, 2018 (the same day as Limas's suspension). In the notice-of-suspension letter to Hughes, manager Haas explained to Hughes that he had violated Sections 34-36(b)(5)(E), (12)(E), and (12)(H) of the Personnel Rules for behaving in an unprofessional manner toward M.C. and using profanity in the email exchange. She also warned Hughes that "[f]uture occurrences of this nature

will not be tolerated and may be cause for additional disciplinary measures, up to and including discharge."

## PROCEDURAL BACKGROUND

Limas filed suit against the City for race discrimination, retaliation, and hostile work environment and harassment.[3] She alleged that after her transfer to Accounts Payable where many of the other employees were African American, she was "almost immediately subjected to discrimination, harassment, hostile environment[,] and retaliation based on [her] race, Hispanic"; treated in a discriminatory manner because of her race; suspended in retaliation for filing a grievance against supervisor Rand; retaliated against and harassed for complaining about discrimination based on her race; and terminated.

The claims in Limas's petition were based on the four following incidents, each involving an African American: the alleged door-closing incident involving Hughes; the alleged hall-purse-attack incident involving Britt; the alleged yelling incident involving supervisor Green; and the chair-slamming incident involving supervisor Rand. As noted above, Limas raised an additional shoulder-touching incident involving supervisor Hill during her deposition.

The City filed a plea to the jurisdiction with evidence, arguing the trial court lacked subject-matter jurisdiction because Limas could not demonstrate any of her

---

[3] Limas also asserted a claim for jury-duty retaliation but does not challenge on appeal the trial court's dismissal of that claim. Thus, we will not address this claim. *See* TEX. R. APP. P. 38.1(f), (i).

claims fell within a waiver of the City's governmental immunity from suit. Limas filed a response with evidence, claiming she raised disputed questions of material fact to preclude the granting of the plea and the City relied upon "false evidence."

The trial court held a hearing and granted the plea, dismissing all of Limas's claims with prejudice.[4] Limas timely appealed.

## STANDARD OF REVIEW

Subject-matter jurisdiction is essential to the authority of the court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). The purpose of a plea to the jurisdiction is to defeat a cause of action "without regard to whether the claims asserted have merit." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012).

Whether a court has subject-matter jurisdiction is a question of law that we review de novo. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217,

---

[4] The trial court also sustained the City's objections to an exhibit Limas refers to as "Notes from Carla Hill" (the Notes), which Limas attached to her response to the plea. Although Limas references the Notes in her appellant's brief, she raises no challenge to the trial court's ruling sustaining the City's objections to the exhibit. Instead, in her reply brief, Limas argues for the first time and without citing any authority, "Hill admitted sufficient points of contact between [the Notes], herself[,] and Ms. Limas to support admission of [the Notes]." To the extent this is an attempt to challenge the trial court's exclusion of the Notes, Limas waived error and may not raise in a reply brief a new issue not raised in her appellant's brief. *See In re M.W.M.*, No. 05-19-00757-CV, 2020 WL 6054337, at *3 n.3 (Tex. App.—Dallas Oct. 14, 2020, no pet.) (mem. op.). Thus, we will neither review the trial court's ruling on the City's objections nor consider the Notes in our de novo review. *See Kuzmin v. Schiller*, No. 05-13-01394-CV, 2015 WL 150206, at *5 (Tex. App.—Dallas Jan. 8, 2015, no pet.) (mem. op.) ("Where the trial court sustains objections to summary judgment evidence and appellant does not challenge the evidentiary ruling on appeal, appellant has waived error regarding that ruling and we may not consider the excluded evidence.").

226 (Tex. 2004). Typically, the plea to the jurisdiction challenges whether the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Garcia*, 372 S.W.3d at 635. When, as in this case, the plea to the jurisdiction challenges the existence of jurisdictional facts, then, like the trial court, we "consider evidence as necessary to resolve any dispute over those facts, even if that evidence 'implicates both the subject-matter jurisdiction of the court and the merits of the case.'" *Id.* (quoting *Miranda*, 133 S.W.3d at 226); *see also Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018).

When a plea challenges the existence of jurisdictional facts, the standard of review mirrors that of a traditional motion for summary judgment. *Garcia*, 372 S.W.3d at 635. "Initially, the defendant carries the burden to meet the summary judgment proof standard for its assertion that the trial court lacks jurisdiction." *Id.* "If it does, the plaintiff is then required to show that a disputed material fact exists regarding the jurisdictional issue." *Id.*; *see also Clark*, 544 S.W.3d at 764 ("[W]hen jurisdictional evidence negates the prima facie case or, as in this case, rebuts the presumption it affords, some evidence raising a fact issue on retaliatory intent is required to survive a jurisdictional plea."). A reviewing court must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving all doubts in the plaintiff's favor. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009); *see also City of Dallas v. Siaw-Afriyie*, No. 05-19-00244-CV, 2020 WL 5834335, at *5 (Tex. App.—Dallas Oct. 1, 2020, no pet.) (mem. op.).

If the pleadings and jurisdictional evidence create a fact question, then the trial court cannot grant the plea, and the issue must be resolved by the factfinder. *Heinrich*, 284 S.W.3d at 378; *Miranda*, 133 S.W.3d at 227–28. If, however, the relevant evidence is undisputed or if the plaintiff fails to raise a fact question on the jurisdictional issue, then the trial court rules on the plea as a matter of law. *Miranda*, 133 S.W.3d at 228; *see also Siaw-Afriyie*, 2020 WL 5834335, at *5.

## GOVERNMENTAL IMMUNITY

Immunity from suit deprives a trial court of subject-matter jurisdiction. *Univ. of Tex. Sw. Med. Ctr. v. Vitetta*, No. 05-19-00105-CV, 2020 WL 5757393, at *4 (Tex. App.—Dallas Sept. 28, 2020, no pet.) (mem. op.). Governmental immunity protects political subdivisions of the State, including cities, from suit unless the State consents. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) (op. on reh'g). A city may assert immunity from suit through a plea to the jurisdiction. *See Clark*, 544 S.W.3d at 770.

The Texas Commission on Human Rights Act (TCHRA), found in Chapter 21 of the Texas Labor Code, provides a limited waiver of immunity. *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 513 (Tex. 2012); *see also Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020). The TCHRA waives immunity from suit only for statutory violations, meaning the trial court lacks subject-matter jurisdiction over the dispute absent some evidence the defendant violated the statute. *See* TEX. LAB. CODE ANN. §§ 21.002(4), .254; *Flores*, 612

–18–

S.W.3d at 305 ("The [TCHRA] waives sovereign immunity from suit, but only if the plaintiff alleges facts that would establish that the state agency violated the [TCHRA] and, when challenged with contrary evidence, provides evidence that is at least sufficient to create a genuine fact issue material to that allegation."). Because a statutory violation is necessary to establish an immunity waiver, jurisdiction and the merits intertwine. *Clark*, 544 S.W.3d at 783–84.

## THE TRIAL COURT DID NOT ERR BY DISMISSING LIMAS'S RACE-DISCRIMINATION CLAIM

In her first issue, Limas argues the trial court erred by dismissing her race-discrimination claim. Because we conclude Limas did not create a material fact issue on her prima facie case, we resolve this issue against her.

### A. Applicable Law and Prima Facie Case

As applicable here, the TCHRA prohibits employers from discriminating against employees because of race. *See* TEX. LAB. CODE ANN. § 21.051. The TCHRA is modeled after federal civil rights law. *See id.* § 21.001(1) (stating a general purpose of the TCHRA is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments"); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001). Thus, analogous federal statutes and cases interpreting them guide our reading of the TCHRA. *Quantum*, 47 S.W.3d at 476. Employment discrimination can be established with either direct or circumstantial evidence. *See Garcia*, 372 S.W.3d at 634.

–19–

When, as in this case, a plaintiff relies upon circumstantial evidence, we follow the three-part burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Flores*, 612 S.W.3d at 305; *Garcia*, 372 S.W.3d at 634. This three-part framework consists of the following: (1) the plaintiff must first create a presumption of illegal discrimination by establishing a prima facie case; (2) the defendant must then rebut that presumption by establishing a legitimate, nondiscriminatory reason for the employment action; and (3) the plaintiff must then overcome the rebuttal evidence by establishing that the defendant's stated reason is a mere pretext. *Flores*, 612 S.W.3d at 305.

In a race-discrimination case, the plaintiff establishes a prima facie case with evidence (1) she was a member of a protected class, (2) she suffered an adverse employment action, and (3) she was treated less favorably than similarly situated members outside of the protected class. *Siaw-Afriyie*, 2020 WL 5834335, at *5. The plaintiff's burden at this stage "is not onerous." *Quantum*, 47 S.W.3d at 477.

In the trial court, the City argued Limas could not state a prima facie case of discrimination because the evidence showed (1) she was not replaced by someone outside her protected class and (2) she was not treated worse than any similarly situated employee outside her protected class with respect to her suspension or termination. The City further argued it demonstrated a legitimate, nondiscriminatory reason for suspending and terminating Limas and Limas could not demonstrate a fact issue showing that this reason was a mere pretext for race discrimination.

On appeal, Limas presents no argument that the City did not meet its initial burden to negate subject-matter jurisdiction. Instead, she argues the evidence created fact issues requiring trial. Although the parties dispute multiple steps of the *McDonnell Douglas* framework, we address only the first, disputed step because we conclude Limas failed to create a fact issue on her prima facie case. *See* TEX. R. APP. P. 47.1; *Flores*, 612 S.W.3d at 305.

**B.**   **Limas Failed to Demonstrate a Material Fact Issue Regarding Disparate Treatment.**

The City does not dispute the evidence established the first two elements of Limas's prima facie case. Thus, we address only the third element.

Limas was not replaced by someone outside her protected group; thus, she must present evidence of a similarly situated employee, a "comparator," who was treated differently than she was treated. *See Wallace v. Seton Family of Hosps.*, 777 F. App'x 83, 87 (5th Cir. 2019) (per curiam). Limas argues a fact issue exists whether Hughes, an African American in Accounts Payable under the same manager, is a comparator who was treated more favorably than Limas, a Hispanic, with respect to the disciplinary action taken against them. We disagree.

**1.**   **Law governing discrimination based on disparate discipline**

"Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Flores*, 612 S.W.3d at 312 (quoting *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam)). Although their circumstances need not be "identical,"

–21–

they must be "nearly identical." *Id*. "Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *Id*. (quoting *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 594 (Tex. 2008) (per curiam)); *see also Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 322 (5th Cir. 2021), *petition for cert. filed*, 2021WL 2890322 (U.S. July 8, 2021) (No. 21-21).

To prove discrimination based on disparate discipline, the disciplined and undisciplined employees' misconduct must be of "comparable seriousness." *Monarrez*, 177 S.W.3d at 917. "Although precise equivalence in culpability between employees is not the ultimate question, . . . the plaintiff must usually show that the misconduct for which [she] was discharged was nearly identical to that engaged in [by an] employee [outside her protected class] whom [the company] retained." *Id*. at 917–18 (internal quotation marks and citation omitted, last brackets in original). "If the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (citation and internal quotation marks omitted); *see also Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 585 (Tex. 2017).

## 2. Hughes is not a comparator with respect to Limas's suspension.

With respect to her suspension, Limas contends on appeal that Hughes is a comparator who received more favorable treatment than she did after the door-closing incident. She argues that they were both classified as an "accused" in the first investigation and that Hughes had "physically restrained" her from opening the door. Yet, Limas argues, she was suspended "while nothing was done to Hughes." Thus, according to Limas, the African American "was treated differently and better" than Limas, a Hispanic. Limas further argues that Hughes was "present and involved in the first three . . . incidents involving Limas" and was listed as a witness in the second investigation.

Limas, however, did not preserve a complaint of disparate-treatment race discrimination with respect to her suspension. *See* TEX. R. APP. P. 33.1(a). In both her petition and response to the City's plea, Limas took the position that her suspension was in retaliation for her filing a grievance against supervisor Rand. She raised no argument in support of her race-discrimination claim that Hughes had engaged in conduct that was comparably serious to the conduct for which Limas was suspended but was not suspended. In fact, she took the opposite position, contending that she and Hughes were suspended at the same time for comparable violations of the Personnel Rules in different incidents. Limas claimed disparate treatment only in her termination, arguing she "and Hughes are comparators and the disparate treatment of firing Plaintiff, a Hispanic, while only [counseling] Jamie Hughes, an

African American, with respect to comparable violations establishes a prima facie case of discrimination." Although this argument referred to Hughes's being only counseled in connection with the door-closing incident, Limas's argument was simply that she was *terminated* for that incident after returning from suspension whereas Hughes was not. Because Limas raised no argument in the trial court of disparate treatment with respect to her suspension, she waived the issue. *See id.*

Even if the issue had been preserved, Limas's arguments are not persuasive for three reasons. First, the fact that Hughes was an "accused" in the first investigation and that Limas disputes what happened with Hughes during the door-closing incident is immaterial to whether Hughes is a comparator for purposes of a disparate-treatment analysis. *See Hinga v. MIC Grp., L.L.C.*, 609 F. App'x 823, 828 n.6 (5th Cir. 2015). The relevant inquiry here concerns what findings and recommendations HR reported to manager Haas. This is because, as Limas admitted at her deposition, manager Haas (who is Caucasian) made the disciplinary decisions at issue, and her decision to suspend Limas was based on the results of HR's two investigations involving Limas.

The differences between Hughes's and Limas's conduct, as determined by HR and reported to manager Haas, accounts for their different discipline. Manager Haas testified that she suspended Limas and not any other Accounts Payable employee, including Hughes, in connection with either of HR's two investigations because HR determined that no other employee's conduct was comparable to Limas's conduct.

–24–

The undisputed evidence is that between the two reports, HR found that Limas had violated the Personnel Rules during the Hughes door-closing incident—as well as during the Miranda copy-room-attack incident, the Britt purse-attack incident, and the Green yelling incident. HR also determined that Limas had caused disturbances in the workplace, had been insubordinate to management, had been discourteous to coworkers, had used profanity in the workplace, had ignored supervisors' instructions to leave the office, and had pushed a coworker.

By contrast, Hughes was an "accused" only in the first investigation involving Limas. The undisputed evidence is that HR determined that although Hughes had "responded to the [door-closing] situation in an unprofessional manner," he was complying with management's instructions to keep the doors closed and "his behavior did not rise to the same level as Ms. Limas'[s] behavior."

Second, Limas's argument that Hughes was involved in the first three incidents involving Limas is not supported by the record. In the second investigation, HR merely interviewed Hughes as a witness and made no findings about him. Limas fails to explain how, if at all, Hughes's mere witnessing of Limas's conflicts with other coworkers or his role as a witness in the second investigation makes him a comparator with respect to the disciplinary action taken against them. Because the pertinent inquiry concerns HR's findings and recommendations to manager Haas, Hughes's role as a witness in the second investigation is immaterial to whether he is

comparator for purposes of establishing disparate treatment based on a disparate-discipline analysis.

Third, Limas fails to explain how Hughes was treated *more* favorably than herself with respect to her suspension when manager Haas issued Hughes the exact same five-day suspension in July 2018, after determining that Hughes had violated some of the same Personnel Rules—but not as many—that Limas had violated.

Although Limas disputes what happened in the actual incidents underlying the two investigations involving herself, the relevant evidence of what HR determined and reported to manager Haas, the decision maker, is undisputed. The difference between HR's findings regarding Limas's and Hughes's conduct accounts for manager Haas's decision to suspend Limas and not Hughes in connection with those investigations—or, more specifically, the door-closing incident. *See Lee*, 574 F.3d at 260. Moreover, manager Haas issued Hughes and Limas identical suspensions based on HR's determinations that Hughes had violated the same (but fewer of the) Personnel Rules as Limas. On this record, and construing the evidence in the light most favorable to Limas, we conclude as a matter of law that Hughes was not a similarly situated employee who was treated more favorably than Limas with respect to her suspension. *See Ross*, 993 F.3d at 322–23; *Crawford v. Tex. Heart Hosp. of the Sw. LLP*, No. 05-18-00501-CV, 2019 WL 3026770, at *5 (Tex. App.—Dallas July 11, 2019, no pet.) (mem. op.).

### 3. Hughes is not a comparator with respect to Limas's termination.

With respect to her termination, Limas asserts four arguments to support her contention Hughes is a comparator who was treated more favorably than she was.

First, Limas argues that she and Hughes had similar violations of the Personnel Rules but that she was "punished more severely than Hughes" because the City terminated her, the Hispanic, sixteen days after her return from suspension but retained Hughes, the African American. This argument, however, ignores the undisputed evidence showing differences between Hughes's and Limas's post-suspension conduct.

The suspension letters that manager Haas issued to Limas and Hughes outlined their respective violations of the Personnel Rules and warned that future occurrences of such nature may be cause for discharge. It is undisputed that just three days after returning from her suspension, Limas accused Brown—a temporary employee who had just started working in Accounts Payable—of intentionally hitting or kicking her toe when they ran into each other in a hallway. Manager Haas testified that she reviewed both of the women's statements concerning this incident; determined Limas had again created a disturbance in the workplace; and, after consulting Wright in HR, decided to terminate Limas.

In order to create a material fact issue, Limas was required to present evidence showing Hughes had also failed to heed manager Haas's warning and engaged in a comparably serious violation of the Personnel Rules after his return from suspension

but was not terminated. *See Ross*, 993 F.3d at 322–23. But there is no evidence in the record of Hughes even being accused of a violation of the Personnel Rules after his suspension. Thus, Limas failed to create a material fact issue on whether Hughes was a similarly situated individual who was treated more favorably than Limas with respect to her termination. *See id.*; *Wallace*, 777 F. App'x at 88; *Michael v. City of Dallas*, 314 S.W.3d 687, 691–92 (Tex. App.—Dallas 2010, no pet.).

Second, Limas argues Hughes is a comparator by pointing to M.C.'s allegations of sexual harassment against Hughes. She claims M.C. had accused Hughes of "hands on sexual harassment" and HR had "recommended that appropriate action be taken against Hughes, but nothing appears to have been done." We reject this argument. The undisputed evidence is that (1) HR determined there was "insufficient evidence" Hughes had sexually harassed M.C. and (2) M.C.'s making of sexual-harassment allegations against Hughes and HR's resulting investigation occurred before Hughes's suspension.[5]

Third, Limas suggests a fact issue exists because she disputes what actually happened in the toe-kicking incident with Brown after her suspension. Limas maintains that she "suffered being kicked by" Brown and questions how "report[ing] an injury suffered on the workplace premises during working hours" can be

---

[5] In her brief, Limas contends Hughes was suspended "for using inappropriate language in an email" and their "suspensions were so similar that Hughes and Limas served their [five-day] suspensions at the same time." But she points to no evidence of Hughes's engaging in similar conduct after his suspension, and we have found none.

"unacceptable conduct." She further contends that Brown's version of events in this incident "is highly questionable" due to differences between Brown's handwritten and typed statements.[6] These arguments are inapposite.

Even if a fact issue exists about what happened in the incident with Brown, that fact issue is immaterial to the issue before us—namely, whether Hughes and Limas were comparators for purposes of a disparate-treatment analysis. *See Hinga*, 609 F. App'x at 828 n.6. It is undisputed that Limas had accused a coworker of kicking her toe in a hallway and that manager Haas determined Limas had again violated the Personnel Rules within days of returning from suspension. Despite her suspension, Limas did not change her behavior upon returning to work. As noted above, Limas offered no evidence of comparable conduct by Hughes.

Finally, Limas cites *Wallace* to support her argument she and Hughes are comparators, arguing that *Wallace* "has virtually the same facts as this case." *See Wallace*, 777 F. App'x at 88. *Wallace*, however, is distinguishable. In that case, the employer allegedly terminated the plaintiff, an African-American woman, because she had attendance issues (eight tardies and five unscheduled absences) and conflicts with three coworkers. *Id*. at 84–86. In concluding that a fact issue existed on the plaintiff's prima facie case of race discrimination based on circumstantial evidence

---

[6] Limas points to the fact the typed statement did not have the title "Accident Today" and added references to Cisneros and Yolonda by name. These minor differences, which do not alter Brown's account of the incident as being a mere accident, are irrelevant to whether Hughes and Limas engaged in "comparably serious" conduct for purposes of a disparate-treatment analysis.

of disparate treatment, the Fifth Circuit explained that other employees outside the plaintiff's protected class committed violations as bad as the plaintiff's or worse but only the plaintiff had been terminated. *Id*. at 88. By contrast, Limas points to no evidence of any comparable post-suspension conduct that would create a fact issue here.

On this record, and construing the evidence in the light most favorable to Limas, we conclude Limas failed to raise a fact question on whether Hughes was a similarly situated employee outside her protected class who was treated more favorably than Limas with respect to Limas's termination. *See Lee*, 574 F.3d at 260; *Michael*, 314 S.W.3d at 691–92.

## C.    Conclusion

Whether two employees are "similarly situated" generally presents a question of fact for the jury. *See Wallace*, 777 F. App'x at 88–89. Here, however, Limas failed to offer evidence from which a jury could reasonably conclude that Hughes and Limas engaged in conduct of "comparable seriousness" for which she was treated less favorably than Hughes. Stated differently, there is no evidence that would allow us to infer, if the City's actions remained unexplained, that it is more likely than not that its actions were based on Limas's race. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015).

Limas failed to meet her burden to create a fact issue on her prima facie case of race discrimination. Thus, the burden never shifted to the City to prove a

–30–

legitimate, nondiscriminatory reason for suspending or terminating Limas, and we need not address the parties' arguments regarding the second and third steps of the *McDonnell Douglas* framework. *See Flores*, 612 S.W.3d at 312 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (noting burden shifts to defendant only "if the plaintiff succeeds in proving the prima facie case")); *Dallas Indep. Sch. Dist. v. Allen*, No. 05-16-00537-CV, 2016 WL 7405781, at *10–11 (Tex. App.—Dallas Dec. 22, 2016, pet. denied) (mem. op.). The trial court properly dismissed this claim for lack of subject-matter jurisdiction. We overrule Limas's first issue.

**THE TRIAL COURT DID NOT ERR BY DISMISSING LIMAS'S RETALIATION CLAIM**

In her second issue, Limas contends the trial court erred by dismissing her retaliation claim. Because we conclude Limas failed to create a fact issue on her prima facie case, we resolve this issue against Limas.

**A. Applicable Law and Prima Facie Case**

The TCHRA prohibits employers from retaliating against a person who "(1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." *Exxon Mobil Corp.*, 520 S.W.3d at 585 (quoting TEX. LAB. CODE ANN. § 21.055); *see also Clark*, 544 S.W.3d at 781. "Opposing a discriminatory practice includes making an internal grievance." *Exxon Mobile Corp.*, 520 S.W.3d at 585. A retaliation claim focuses on the employer's response to

–31–

an employee's protected activity. *Clark*, 544 S.W.3d at 763–64. A remedy exists only when the evidence establishes that a materially adverse employment action resulted from the employee's protected activity. *Id*. at 764.

The *McDonnell Douglas* burden-shifting framework also frequently applies to retaliation claims relying on circumstantial evidence, such as this case. *See id*. at 764, 782; *Siaw-Afriyie*, 2020 WL 5834335, at *6.

To prevail on a retaliation claim, a plaintiff must prove (1) she engaged in an activity protected by the TCHRA, (2) she experienced an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Exxon Mobil Corp.*, 520 S.W.3d at 585. Opposition to a discriminatory practice is a protected activity irrespective of the merits of the underlying discrimination claim. *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015). But "to establish an employee opposed a discriminatory practice, the employee must demonstrate a good-faith, reasonable belief that the underlying discriminatory practice violated the TCHRA." *Id*.

In the trial court, the City argued (1) the evidence showed Limas did not engage in a protected activity prior to her suspension or termination, (2) the City had legitimate, nonretaliatory reasons for suspending and terminating Limas, and (3) Limas could not raise a fact issue as to retaliatory intent.

On appeal, Limas presents no argument that the City did not meet its initial burden to negate subject-matter jurisdiction. Instead, she contends that fact issues

–32–

exist requiring trial. Although the parties dispute multiple steps of the *McDonnell Douglass* framework, we address only the first because we conclude Limas failed to create a fact issue on whether she engaged in protected activity. *See Tex. Dep't of Transp. v. Lara*, No. 19-0658, 2021 WL 2603689, at \*8–9 (Tex. June 25, 2021); *Flores*, 612 S.W.3d at 305.

**B.  Limas Failed to Demonstrate a Material Fact Issue Regarding Her Engagement in Protected Activity.**

Limas generally alleged in her petition that she was retaliated against for complaining to her manager about discrimination based upon her race. On appeal, Limas points to her making of "a verbal or a written complaint or a witness statement" after the following five events as constituting her "protected activity":

(1)    the "closed door incident" involving Hughes in February 2018;

(2)    the "hall [purse] attack incident" involving Britt in April 2018;

(3)    the supervisor Green "yelling incident" in April 2018;

(4)    the supervisor Rand "chair slamming incident" in July 2018; and

(5)    the Brown "[toe-]kicking incident" in August 2018.[7]

Based on our review of the record, we conclude none of Limas's complaints with respect to any of these incidents invoked the protections of the TCHRA.

---

[7] In the trial court, Limas expressly referenced only her grievance against supervisor Rand and her complaint against Brown (items (4) and (5) above) in the section of her response to the Plea addressing her retaliation claim. But she referred to incidents (1)–(3) elsewhere throughout her response. We assume without deciding that Limas's arguments in the trial court were sufficient to preserve her argument on appeal that her complaints in connection with incidents (1)–(3) constituted protected activity.

To engage in protected activity, an "employee's complaint must, at a minimum, alert the employer to the employee's reasonable belief that unlawful discrimination is at issue." *Clark*, 544 S.W.3d at 786; *see also Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam); *Lara*, 2021 WL 2603689, at *10–11; *Sykes v. Driftwood Hosp. Mgmt., LLC*, No. 01-18-00552-CV, 2019 WL 1246337, at *6 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.). "'Magic words' are not required to invoke the TCHRA's anti-retaliation protection." *Clark*, 544 S.W.3d at 786. "But complaining only of 'harassment,' 'hostile environment,' discrimination,' or 'bullying' is not enough." *Id.* at 786–87. "There must be some indication of [racial] motivation . . . ." *Id.* at 787.

Here, although Limas accused numerous coworkers of mistreatment and made vague complaints of "harassment," there is no evidence she even believed racial discrimination was at issue at the time, and none of her complaints alleged that the purported harassment was on account of Limas's race. In fact, the record reflects the opposite. At her deposition, Limas testified to the following:

(1) Neither manager Haas nor any supervisor or employee in Accounts Payable had ever made any statement that had led Limas to believe that they had discriminated against her based on her race. She was not aware of manager Haas or any Accounts Payable supervisor or employee having made any derogatory or negative statements about Hispanics.

(2) When she complained to manager Haas about the door-closing incident involving Hughes, Limas did not say that she believed Hughes's actions were because of her race.

(3)     When she complained to supervisor Hill or supervisor Green about the hall-purse-attack incident involving Britt, Limas did not say that she believed Britt's actions were because of Limas's race.

(4)     Her grievance against supervisor Rand did not say anything about race.

(5)     When she met with a human resources analyst about her grievance against supervisor Rand, she did not tell the analyst that she believed supervisor Rand's actions were because of her race.

(6)     When she complained to manager Haas about the chair-slamming incident involving supervisor Rand, she did not say that supervisor Rand's actions were because of Limas's race.

(7)     When she complained to supervisor Hill about the toe-kicking incident involving Brown, Limas did not that say that Brown had stepped on her because of her race. Limas also testified that she "would not know [Brown's] motive reason" for intentionally stepping on her and that Brown "had just started working there."

(8)     In her conversation with supervisor Hill and Wright in HR about the shoulder-touching incident involving supervisor Hill, she did not report a belief that supervisor Hill's actions were because of Limas's race.

Moreover, although Limas submitted an affidavit with her response to the plea, she did not testify that she believed unlawful discrimination was at issue when she made any complaint or that she complained about race discrimination, any racially charged statements, or any racial motivations at any time prior to her termination.

Similarly, manager Haas testified that while Limas worked in Accounts Payable, Limas complained to her only twice: once about supervisor Hill's not providing her with adequate training and once about supervisor Rand's alleged pushing of her chair into Limas's cubicle. According to manager Haas's testimony, Limas never told her that she believed that these incidents were based on her race or

any other protected category; Limas never gave her a specific reason as to why she believed these incidents had occurred. Manager Haas further testified that she had "no knowledge of Ms. Limas ever complaining about discrimination or harassment based on her race or any other protected category while she was employed with the City of Dallas."

Limas does not argue any of the above-listed evidence is contradicted by any other evidence in the record, and we have found no contrary evidence.

Instead, Limas argues on appeal it was protected activity for her to complain about the alleged "physical and verbal assaults," to "peacefully walk[] in the hallway" outside her office, to complain about a workplace "injury inflicted by an African American coworker," and to file a grievance asking for "[s]afety and unnecessary disruption of the work area." We disagree. The TCHRA is not a "general civility" code. *Id*. at 806. "Vague complaints of mistreatment, or of offensive and derogatory comments, which do not specifically import a person's race . . . do not invoke protection under the TCHRA." *Univ. of Tex. Health Scis. Ctr. at Tyler v. Nawab*, 528 S.W.3d 631, 643 (Tex. App.—Texarkana 2017, pet. denied); *see also* TEX. LAB. CODE ANN. § 21.001(1). Although Limas accused her coworkers of "harassment," of yelling at her, and of intentionally hitting her, she points to no evidence that she suggested these alleged actions were motived by race when she complained.

Rather than arguing she explicitly alerted the City to a belief racial discrimination was at issue, Limas cites *Barnes v. Prairie View A & M University*, No. 14-15-01094-CV, 2017 WL 2602723, at *4 (Tex. App.—Houston [14th Dist.] June 15, 2017, pet. denied) (mem. op.), to argue that "harassment need not necessarily be racially explicit to be actionable." She then argues that here, the mere fact that she, a Hispanic, complained about actions taken by six individuals, including a supervisor, who were African American alerted the City to the racial character of the acts of discrimination and retaliation. Limas also contends that her engaging in protected activity is further evidenced by her being a complainant in "5 out of the 6 incidents" at issue.[8] These arguments are not persuasive for two reasons.

First, *Barnes* is inapposite because it is a hostile-work-environment case and not a retaliation case. *See id.* at *1. Second, it is undisputed that Limas did not file complaints against only African Americans. She also accused Miranda, a Hispanic, of intentionally hitting her arm outside a copy room—just as she accused (1) Brown, an African American, of intentionally hitting her toe outside a bathroom and (2) Britt, an African American, of intentionally hitting Limas's stomach with her purse and bag in an office hallway.[9] Limas fails to explain how she alerted the City to the "racial character" of her complaints simply by making complaints against African-

---

[8] Limas also argues HR did not investigate the Brown toe-kicking incident, but whether HR investigated her complaint is irrelevant to the question of whether Limas's complaint against Brown was protected activity. *See Nicholas*, 461 S.W.3d at 137.

[9] At deposition, Limas testified that she did not believe Miranda was harassing or discriminating against her.

American coworkers when she also accused a Hispanic of essentially identical misconduct. We conclude that this evidence, standing alone, was insufficient to alert the City to any reasonable belief that unlawful discrimination is at issue.

## C.     Conclusion

On this record, and construing the evidence in the light most favorable to Limas, we conclude as a matter of law that Limas's complaints were insufficient to invoke protections under the TCHRA. *See Brown*, 406 F. App'x at 840; *Exxon Mobil Corp.*, 520 S.W.3d at 585–86; *Sykes*, 2019 WL 1246337, at *4–6; *Nawab*, 528 S.W.3d at 642–43. There is no evidence from which a jury could reasonably conclude Limas alerted the City to a reasonable belief, if any, that illegal discrimination was at issue.[10] *See Lara*, 2021 WL 2603689, at *10–11; *Clark*, 544 S.W.3d at 786–88; *see also Nicholas*, 461 S.W.3d at 137–39. Because Limas failed to meet her burden to create a fact issue on her prima facie case of retaliation, the burden never shifted to the City to prove a legitimate, nonretaliatory reason for suspending or terminating Limas, and we need not address the parties' arguments regarding the second and third steps of the *McDonnell Douglas* framework. *See Flores*, 612 S.W.3d at 312. The trial court properly dismissed this claim for lack of subject-matter jurisdiction. We overrule Limas's second issue.

---

[10] Limas does not contend her allegation that supervisor Hill touched her shoulder, despite supervisor Hill's being African American, constituted protected activity. Even if we construed her brief liberally as including this incident, the record reflects that supervisor Hill, not Limas, reported this incident and Limas testified that she did not claim that supervisor Hill's actions in this incident were because of Limas's race.

## THE TRIAL COURT DID NOT ERR BY DISMISSING LIMAS'S CLAIM OF HOSTILE WORK ENVIRONMENT AND HARASSMENT

In her third issue, Limas argues the trial court erred by dismissing her claim of hostile work environment and harassment. Because we conclude Limas failed to create a fact issue on her prima facie case, we resolve this issue against Limas.

### A. Applicable Law and Prima Facie Case

A claim for hostile work environment "entails ongoing harassment, based on the plaintiff's protected characteristic, so sufficiently severe or pervasive that it has altered the conditions of employment and created an abusive working environment." *In re Parkland Health & Hosp. Sys. Litigation*, No. 05-17-00670-CV, 2018 WL 2473852, at *8 (Tex. App.—Dallas June 4, 2018, no pet.) (mem. op.). The elements of a prima facie case of hostile work environment are as follows: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on the protected characteristic; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Id.*

In the trial court, the City argued it negated elements two, three, and four with supporting evidence. Limas presents no argument the City did not meet its initial burden to negate subject-matter jurisdiction. Although the parties dispute on appeal whether a fact issue exists on all three of these elements, we need address only element three because we conclude Limas failed to create a fact issue showing the

harassment complained of was based on a protected characteristic. *See* TEX. R. APP. P. 47.1.

**B.**   **Limas Failed to Demonstrate a Material Fact Issue Regarding Harassment Based on a Protected Characteristic.**

In the trial court and on appeal, to prove harassment, Limas relies upon the following six incidents of alleged physical or verbal assault: (1) "Hughes prevented [Limas from opening the doors] by putting his hands over hers"; (2) "Britt knocked [Limas's] breath out" when Britt hit Limas with her bags; (3) supervisor Green "scream[ed] at [Limas]"; (4) supervisor Rand created a disturbance at Limas's cubicle in the "[w]all banging disturbance"; (5) Brown "kicked [Limas's] toe in [the] hall"; and (6) supervisor Hill "pointed [her] finger on [Limas]," touching Limas's shoulder. Limas contends on appeal these acts of alleged harassment were all (1) based on her race and (2) retaliatory in nature. We address both grounds in turn.

**1.**   **Racial harassment**

In the trial court, the City argued that Limas could not raise a fact issue showing she was harassed or subjected to a hostile work environment based on her race. The City attached Limas's deposition testimony wherein she admitted (1) no Accounts Payable manager, supervisor, or employee had ever made any statement that led Limas to believe that they had discriminated against her based on her race and (2) she was not aware that any Accounts Payable manager, supervisor, or employee ever made any derogatory or negative statements about Hispanics.

Limas argues that because each of the six incidents of alleged harassment were against her, a Hispanic, and were committed by African Americans, including two supervisors, a fact issue exists on whether the harassment was based on her race. She argues, "The Supreme Court has expressly held that numbers matter and expressly approved statistical testimony. See [sic] *supra*." This argument, which does not point us to any specific authority, is not persuasive.

The only Texas Supreme Court or United States Supreme Court cases cited in Limas's brief mentioning statistics are *Quantum* and *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), but both cases are distinguishable. In *Quantum*, a plaintiff engineer sued his former employer for age discrimination and produced at trial (1) evidence showing he was replaced by "two considerably younger engineers" and (2) "statistical evidence that older Quantum engineers had a much higher rate of turnover than their younger counterparts." 47 S.W.3d at 481–82. The court concluded this was legally sufficient evidence the employer was motivated by age discrimination when it fired the plaintiff (addressing the third step of the *McDonnell Douglas* framework). *Id*. at 482. In *Teamsters*, the Supreme Court concluded the government carried its burden to prove racial discrimination was a company's standard operating procedure based on evidence showing the following:

(1)     out of 6,472 employees, only "314 (5%)" were African American and "257 (4%)" were Hispanic;

(2)     out of 1,828 line drivers, "only 8 (0.4%)" were African American and "5 (0.3%)" were Hispanic, and all of the African Americans "had been hired after the litigation had commenced";

(3)     the company did not employ an African American on a regular basis as a line driver until 1969, except for one man from 1950 to 1959;

(4)     in 1971, all of the company's line drivers were White in areas of substantial African-American population; and

(5)     the majority of the African Americans (83%) and Hispanics (78%) who did work for the company held the lower-paying jobs whereas only 39% of "nonminority employees" held jobs in those categories.

*Teamsters*, 431 U.S. at 337–38.

By contrast, Limas was replaced by someone within her protected class (Hispanic). And she offered no evidence of the current or historical race of City employees in Accounts Payable or any statistical evidence showing, for instance, the effect of race on the turnover rate or on the incidence rate of harassment complaints in Accounts Payable. The fact that Limas, who is Hispanic, lodged complaints against six different African Americans (excluding Miranda, a Hispanic) of alleged harassment is not a statistical analysis. We cannot infer discriminatory intent merely from a person's race; there must be evidence showing the conduct at issue was motivated by a discriminatory animus.[11] *See Barnes*, 2017 WL 2602723, at *4; *Nawab*, 528 S.W.3d at 642; *Michael*, 314 S.W.3d at 691–92. Here, Limas points to no such evidence, and we have found none.[12]

---

[11] For the same reason, we reject Limas's argument, for which she cites no authority, that "[t]he fact that the numbers in this case are so overwhelming that statistical analysis is unnecessary to evidence racial bias should not serve to obscure the racial bias fact issue created by the numbers in the case."

[12] Limas similarly argues that "numbers in the form of statistical analysis are both relevant and helpful in 'proving,['] and 'disproving' employment discrimination," citing the Fifth Circuit's opinion in *Runnels v. Texas Children's Hospital Select Plan*, 167 F. App'x 377, 380–82 (5th Cir. 2006) (per curiam). But *Runnels* is readily distinguishable because it involves the admission of a defendant's expert report under

Limas nonetheless points to the purported "frequency and consistency" in which she contends these six events occurred as evidence of the racial character of these alleged acts of harassment, claiming "a rate of one (1) per month." She also argues that supervisor Hill tried to coordinate efforts to get Limas terminated, pointing to (1) changes in supervisor Hill's deposition testimony about how she described Limas's complaint about the incident with Britt and (2) an email from Arlene Cisneros (a Senior Office Assistant) to manager Haas and supervisor Rand wherein Cisneros said that supervisor Hill had accused her of "going around telling people that [supervisor Hill had] pushed on getting [Limas] terminated." Limas's arguments, however, are irrelevant because they do not address how, if at all, any of the alleged acts of harassment at issue were based on Limas's race.[13]

On this record, and construing the evidence in the light most favorable to Limas, we conclude the evidence is insufficient to create a fact issue that the harassment complained of was based on Limas's race. Even if we assume Limas's version of what happened in each incident is true, the fact that Limas, a Hispanic,

---

Federal Rule of Evidence 702, which is not at issue here. Further, as stated above, Limas presented no evidence of a statistical analysis in this case.

[13] We note that Limas also argues on appeal, though not specific to any issue, the City's plea was based on "false evidence" for the following reasons, all of which involve supervisor Hill in some respect: (1) supervisor Hill gave inconsistent deposition testimony regarding what Limas reported to her about the incident with Britt; (2) supervisor Hill testified at deposition that she did not push on getting Limas terminated, but, Limas argues, this was contradicted by an email; and (3) Brown "participated in a story cooked up by the conspirators that [Limas] was complaining about assaults that were just 'accidents'" as evidenced by, Limas contends, the differences between Brown's handwritten and typed statements, which Brown gave to supervisor Hill. Limas argues that this "false evidence" establishes pretext. These arguments are immaterial; we do not reach the issue of pretext on any claim.

was physically or verbally harassed by six African-American coworkers and one Hispanic coworker is insufficient, without more, to create a material fact issue that the harassment was race based.

## 2. Retaliatory harassment

With respect to retaliatory harassment, the City argued in the trial court that Texas has not recognized claims for retaliatory hostile work environment and that even if such claims were recognized, Limas did not engage in protected activity and, therefore, cannot raise a fact issue showing she was subjected to a hostile work environment based on retaliation. On appeal, Limas argues that "[t]he hostile work environment [Limas suffered] resulted from retaliation against her because [she] dared to complain on multiple occasions as listed above." She contends that she was the complaining party to HR in five of the six above-listed incidents of harassment and that such complaints constituted protected activity. In Limas's response to the City's plea, however, she did not raise any argument in support of her claim for hostile work environment based on retaliation; therefore, Limas preserved nothing for our review with respect to this claim. *See* TEX. R. APP. P. 33.1(a).

Even if Limas had preserved this complaint, she failed to create a fact issue on whether she engaged in any protected activity while she was employed by the City, as discussed above. Thus, we need not address whether a cause of action for retaliatory hostile work environment is cognizable in Texas. *See Parkland Health & Hosp. Sys. Litigation*, 2018 WL 2473852, at *8.

## C. Conclusion

Accordingly, we conclude Limas failed to create a genuine fact issue on her prima facie case of hostile work environment and harassment. The trial court did not err by dismissing this claim for lack of subject-matter jurisdiction. We overrule Limas's third issue.

### CONCLUSION

Having overruled Limas's three issues, we affirm the trial court's judgment.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

191223F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MARIA RUTH LIMAS, Appellant

No. 05-19-01223-CV      V.

CITY OF DALLAS, Appellee

On Appeal from the 116th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-18-16334. Opinion delivered by Justice Osborne. Justices Schenck and Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee CITY OF DALLAS recover its costs of this appeal from appellant MARIA RUTH LIMAS.

Judgment entered July 28, 2021.