**Affirmed and Memorandum Opinion filed July 9, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00127-CV

### JEROME KARAM AND JMK5 HOLDINGS, LLC, Appellants

### V.

### THE AKERS FIRM, PLLC; BROCK AKERS; CORDT AKERS; DALY & BLACK, P.C.; AND ANDREW DAO, Appellees

**On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Cause No. 22-CV-1147**

## MEMORANDUM OPINION

Appellants Jerome Karam and JMK5 Holdings, LLC filed suit against appellees The Akers Firm, PLLC; Brock Akers; Cordt Akers; Daly & Black, P.C.; and Andrew Dao for defamation and civil conspiracy.[1] Appellees filed a motion to dismiss appellant's suit pursuant to the Texas Citizens Participation Act ("TCPA");

---

[1] Because they have the same last name, we will refer to Cordt Aker and Brock Akers by their first names.

the trial court granted appellees' motion. In two issues on appeal, appellants assert that (1) the trial court erred in dismissing their claims and (2) the trial court erred in awarding attorney's fees to appellees. Concluding that appellants did not meet their burden under step two of the TCPA, we affirm the judgment as challenged on appeal.

## I.    BACKGROUND

Karam is the founder and owner of JMK5, which owns and operates multiple properties and businesses in Galveston County which appellants self-describe as spanning "millions of square feet." Appellees are the lawyers and law firms representing Ashlyn Moore in a suit against Karam and JMK5.

According to Moore, Karam approached her while she was exercising at World Gym—one of the businesses operated by JMK5. Moore knew him as the owner of the bar she worked at. Karam indicated he wanted to show Moore the massage therapy offices at the gym. Karam walked Moore to an isolated hallway of mostly-empty offices. While there, Karam began making "inappropriate comments" to Moore. Karam then led Moore to the cryo-chamber, instructing her to get into it. He closed the door and indicated he wanted a surprise when he opened the door. When he opened it, Karam expressed his disappointment that Moore was still clothed and demanded she take off her clothes. Moore claims she said no, but Karam would not step aside from the door of the cryo-chamber, which was the only way to exit. Moore alleges that "Karam began groping her, outside of her clothing. . . . pull[ing] out cash and then put[ting] it into Moore''s clothes. . . . groping Moore inside of her clothing, ultimately touching her breasts, buttocks, and placing his finger on and around her anus without her consent."

Moore met with a detective from the Texas City Police Department and detailed her allegations against Karam. Based on her description of the event, the

Galveston Criminal District Attorney's Office (DA's Office) did not accept charges and stated there was no need to interview Karam. After the DA's Office declined to press charges, Moore made several posts on various social media platforms accusing Karam of sexually assaulting her.

Karam filed suit against Moore for defamation per se, seeking $100 million in damages and an injunction to prevent Moore from publishing further accusations against Karam. Moore retained appellees to represent her in Karam's suit. The Akers firm sent a letter, signed by Brock Akers, to Karam's counsel, seeking an "early and quiet resolution." Attached to the letter was a counterclaim; appellees informed Karam that the counterclaim had not yet been filed but "[we] thought we would reach out to you to consult with Mr. Karam about whether or not he has concerns about how very public all of this will become once it is filed."

Moore later filed an amended answer that included counterclaims against Karam and JMK5, seeking $1 million in damages and alleging claims of sexual assault, assault, battery, negligence, gross negligence, and respondeat superior.[2] Moore's counterclaim asserted that Karam sexually assaulted her, that Karam had acted inappropriately numerous times against other employees, both sexually and nonsexually, that JMK5 was aware of Karam's conduct and yet did nothing about it.

Then, appellees collectively made several public statements related to the case:

- Cordt gave an interview with a television news reporter, asserting, in part, that Karam sexually assaulted Moore.
- Dao made a post on Instagram summarizing what one of Karam's

---

[2] As appellants boldly proclaim: "Karam did not capitulate to the Defendants' demands[.]" The record does not make it clear whether the out-of-court negotiations failed or Karam simply refused to negotiate in the first place.

former HR manager's had allegedly told him.

- Dao gave an interview to *The Daily Beast*, claiming, in part, that "Karam sexually assaulted our client."

Based on these statements, appellants filed the present suit against appellees, alleging claims of defamation, defamation per se, civil conspiracy to defame, negligence, gross negligence, and business disparagement. Appellants later dismissed the claims for negligence, gross negligence, and business disparagement, leaving the claims for defamation, defamation per se, and civil conspiracy to defame. Appellees filed a motion to dismiss appellants' suit pursuant to the TCPA. The trial court granted the motion to dismiss and awarded attorney's fees.

## II. TCPA ANALYSIS

In appellants' first issue, they contend the trial court erred in dismissing their claims pursuant to the TCPA.

### A. Standard of review and applicable law

"The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015); *see* Tex. Civ. Prac. & Rem. Code Ann. § 27.002. The TCPA contemplates an expedited dismissal procedure when a "legal action" is "based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association[.]" Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a). The right of free speech and right to petition are at issue in this appeal. To accomplish this objective, the TCPA provides a multi-step process for the dismissal of a "legal action" to which it applies. *See Montelongo v. Abrea*, 622 S.W.3d 290, 295–96 (Tex. 2021). In the first step, the party filing a motion to dismiss under the TCPA bears the burden to demonstrate that the legal action "is based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association[.]" Tex. Civ. Prac. & Rem.

4

Code Ann. §§ 27.003(a), .005(b).

But under the second step, the court may not dismiss the action if the nonmovant "establishes by clear and specific evidence a prima facie case for each essential element of the claim." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c). "Prima facie [evidence] . . . is the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *USA Lending Group, Inc. v. Winstead PC*, 669 S.W.3d 195, 200 (Tex. 2023) (internal quotation marks omitted). "Evidence is 'clear and specific' if it provides enough detail to show the factual basis for the claim." *Id.*

Under the third step, the movant can still win dismissal if he establishes "an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d).

In construing the TCPA and determining its applicability, we review statutory construction issues de novo. *See Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam). Similarly, whether the parties have met their respective burdens is a question of law that we review de novo. *See Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019). Under the de-novo standard, we make an "independent determination and apply the same standard used by the trial court in the first instance." *Fawcett v. Grosu*, 498 S.W.3d 650, 656 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (internal quotation marks omitted). In conducting our review, we view the pleadings and evidence in the light most favorable to the nonmovant. *Sanchez v. Striever*, 614 S.W.3d 233, 242–43 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (collecting cases).

## B. Second step of the TCPA framework

Appellants do not dispute that the TCPA applies to this suit. However, under the second step of the analysis, appellants contend they established, with clear and specific evidence, a prima facie case for each essential element of their claims.

5

Appellants further argue that appellees could not establish any affirmative defenses as a matter of law. We need not reach the third step of the TCPA because appellants did not establish by clear and specific evidence a prima facie case for each essential element of their claim. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c).

### 1. Defamation and defamation per se

The elements of defamation are: (1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement; and (4) damages, unless the statement constitutes defamation per se. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam). "In a defamation case that implicates the [TCPA], pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a motion to dismiss under the [TCPA]." *Id.* (internal quotation marks omitted). A statement is considered published when it is communicated to a third person who is capable of understanding its defamatory meaning and in such a way that the person understood its defamatory meaning. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017).

### a. Karam's defamation claim against Cordt Aker

Karam's defamation claim against Cordt is premised on the following statements that Cordt made to a news reporter in response to a media inquiry regarding the suit filed by Moore against Karam:

(1) Karam "lured" Moore into an empty area of World Gym;

(2) Karam "grope[d]" Moore on January 31, 2022 "against her will"; and

(3) Moore was "powerless" because Karam, a "60-something year old-man . . . blocked her exit" during the encounter.

Even though fault is the third element, we begin by analyzing whether Karam met

6

his burden to show prima facie evidence on the element of fault because it is dispositive in this case.

"A private individual need only prove negligence, whereas a public figure or official must prove actual malice." *In re Lipsky*, 460 S.W.3d at 593. "'Actual malice' in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth." *Id.* Under the negligence standard, the defendant is negligent if they "knew or should have known a defamatory statement was false." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 440 (Tex. 2017).

We do not need to address whether Karam is a private or public individual because we conclude that Karam did not establish a prima facie case of actual malice or negligence regarding Cordt's statements. Karam does not assert that Cordt was aware of his statements being false, but Karam argues that Moore's statements had a "high probability of falsity," and thus Cordt acted with reckless disregard for the truth of the statements or at least should have known that the statements were false. According to Karam, the evidence reflects Cordt's negligence/malice in several ways.

First, Karam claims that Moore is a "pathological liar" and her allegations of sexual assault had a "high probability of falsity," as proven by a Tiktok video she posted in which she lip-syncs to an audio track of a woman saying, "I love lying." However, this social media post does not even raise a scintilla of evidence regarding her propensity to lie or the truthfulness of her allegations. Such a video, posted a year before her allegations of sexual assault, would not make a reasonable attorney doubt the claims of their client, and that is assuming the attorney was even aware of the video's existence. And nothing in the record or pleadings indicates that Cordt was aware of the Tiktok video before he made his statement to the public media.

Karam next argues that Cordt's negligence/malice was demonstrated by his failure to fully investigate the contents of Moore's statements to the police. According to Karam, the decision of the DA's Office's to not press charges against Karam should have revealed to Cordt that Moore's allegations were false. However, "[b]are, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA. . . . Opinions must be based on demonstrable facts and a reasoned basis." *In re Lipsky*, 460 S.W.3d at 592 (internal citations omitted). Appellants' bare opinion that Cordt failed to investigate is not supported by any facts. To the contrary, Cordt's statements to the media closely tracked the statements made by Moore to the police, suggesting he did investigate her statements. Also, the investigation performed by Cordt and the other appellees unearthed the fact that other women claimed to have had similar experiences with Karam, which would only provide Cordt with more reason to believe Moore's assertions, not less.

Karam also argues that Cordt acted with negligence or malice because the record reflects that Moore had three motivations for lying. Two of the alleged motivations were only made known through an affidavit—by one of Moore's prior co-workers—that was submitted after Cordt gave his statements to the news. It is unclear whether Cordt was aware of these facts and alleged motivations at the time he made his statement. The affidavit suggested that Moore had lost her job at a bar that was indirectly owned by Karam and JMK5. The co-worker also averred that Moore had asked for Karam's number and wanted him to be her "sugar daddy." The third-alleged motivation Moore had for lying was the fact that Karam had evicted her father, and that Moore's father was "extremely hostile during the eviction." But just because Moore's father had been evicted by Karam does not provide a reasonable basis to conclude that Moore made false statements and that

Cordt knew or should have known his statements were false at the time he made them. *See id.* Claiming that Cordt knew, or should have known, Moore was lying simply because she ostensibly had a motive to lie is nothing more than a bare conclusion. *See id.*

Because we conclude that Karam failed to provide prima facie evidence regarding fault, we conclude trial court did not err in dismissing Karam's defamation suit against Cordt.

### b. Karam's defamation claim against Brock Aker

There is no evidence in the record that Brock ever made defamatory statements about Karam or JMK5. At most, the record shows that Brock signed the presuit demand letter to Karam and Moore's first amended answer with counterclaims, but neither of those were published by Brock to a third party. *See Rincones*, 520 S.W.3d at 579. Therefore, the trial court did not err in dismissing Karam's defamation claim against Brock.

### c. Karam's defamation claim against the Aker firm

There is also no evidence that the Aker firm itself made any defamatory statements about Karam. Karam alleges that Cordt was speaking "on his firm's behalf" when he spoke to the news reporter. But Karam does not offer any factual support for this allegation. *In re Lipsky*, 460 S.W.3d at 592 ("[b]are, baseless opinions do not create fact questions"). To the contrary, the news article associated with the press interview attributed the statements to Cordt individually, not the Aker law firm. Therefore, the trial court did not err in dismissing Karam's defamation claim against the Aker firm.

### d. JMK5's defamation claims against the Aker appellees, collectively

There is no evidence that any of the Aker appellees made any defamatory statements about JMK5 as a business. All the alleged defamatory statements were

about Karam. Therefore, the trial court did not err in dismissing JMK5's defamation claims against the Aker appellees.

### e. JMK5 and Karam's defamation claims against Dao and Daly & Black

JMK5 and Karam identify two instances in which Dao allegedly defamed them: (1) an Instagram post and (2) an interview with *The Daily Beast*. Karam and JMK5 claim that in his Instagram post, Dao "affirmatively and independently stated Mr. Karam sexually assaulted Ms. Moore, that [Karam] had committed multiple previous sexual assaults, and that [JMK5] swept [them] under the rug." But that misrepresents what Dao said in his Instagram post:

> After the sexual assault of our client, one of Jerome Karam's former Human Resources managers in his company reached out to our client. The HR manager indicated she had quit because the guilt was killing her, and also indicated that what our client described had also previously happened to 'many other women.' The incidents were swept under the rug.

Appellants have never contested that a former HR manager reached out to Dao nor do they challenge the veracity of the alleged statements made by the former HR manager. Thus, regarding the Instagram post, appellants did not present prima facie evidence that Dao's Instagram post constituted a false statement. And for the same reasons stated above in analyzing Cordt's alleged fault, appellants have not demonstrated negligence or malice on Dao's part; nothing in the record suggests that Dao knew or should have known that what he was posting was false.

Concerning the *Daily Beast* interview, we conclude that appellants have did not demonstrate prima facie evidence of fault. The following paragraph appeared in the news article following Dao's interview:

> "In short: Karam sexually assaulted our client," attorney Andrew Dao told The Daily Beast, alleging that Karam "has a history" of such misconduct. "Our client filed a police report and spoke out about it[.] Karam then initiated a lawsuit and sued . . . in an attempt to silence

10

her. After he filed this lawsuit, one of his former HR managers reached out to our client, to essentially say that this misconduct by Karam has gone on for far too long, and that his company has been sweeping it under the rug."

Regarding the second half of the paragraph, appellants have not shown Dao published a false statement for the same reasons as those stated above: appellants have not disputed the assertion that one of Karam's former HR managers reached out to Dao. Further, appellants have not shown that Dao's claim that Karam "has a history" of such sexual misconduct was a "false statement." The record contains evidence that before Moore's allegations in this suit, at least one woman was awarded $100,000 for alleging Karam molested her, after she intervened in the suit of another woman who raised similar claims against him.

The only potentially false statement remaining is "Karam sexually assaulted our client," but our analysis as it applied to Cordt's statements apply equally here; appellants did not establish prima facie evidence that Dao knew or should have known that statement was false. Appellants present no evidence demonstrating that Dao acted unreasonably in making this statement or in investigating Moore's claims.

Regarding the defamation claims against Daly & Black, it is unclear what defamatory statements the firm allegedly made, but to the extent appellants' claims are based on Dao's statements above, we apply the same reasoning to conclude there is no evidence that Daly & Black acted with negligence or malice in making any allegedly defamatory statements. We also note that there is no evidence that Dao was speaking on behalf of Daly & Black; the article attributes the quote to Dao as an individual and does not mention Daly & Black.

Therefore, the trial court did not err in dismissing the defamation claims against Dao and Daly & Black. Having concluded that the trial court did not err in dismissing all of appellants' defamation claims against appellees, we next address

appellants' conspiracy-to-defame claims.

## 2. Conspiracy to Defame

The essential elements of a civil conspiracy require that two or more persons have a meeting of the minds to accomplish an unlawful objective and take one or more unlawful, overt acts to accomplish the objective. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017); *see also Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) ("[C]ivil conspiracy requires specific intent" to agree "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.").

"[C]ivil conspiracy is not an independent tort . . . . [it] is a theory of vicarious liability." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140, 142 (Tex. 2019). Thus, "a lawsuit alleging a civil conspiracy that committed some intentional tort is still a 'suit for' that tort." *Id.* at 142. As applied to this case, a plaintiff must prove the underlying tort of defamation to establish liability on a conspiracy-to-defame theory. *See id.*

Because we have already concluded that appellants did not establish prima facie evidence on every essential element of their defamation claims against appellees, it necessarily follows that appellants did not demonstrate by prima facie evidence that appellees conspired to defame appellants. *See Dallas Symphony Ass'n, Inc. v. Reyes*, 571 S.W.3d 753, 763 (Tex. 2019) ("Without defamation, there can be no conspiracy to defame."). The trial court did not err in dismissing appellants' conspiracy-to-defame claims against appellees.

We overrule appellants' first issue.

## III. ATTORNEY'S FEES

In their third issue, appellants argue that the trial court erred in awarding Daly & Black $140,000 in attorney's fees relating to the defamation and conspiracy-to-defame claims, arguing that the amount was "unreasonably large."

12

Appellants do not challenge the fees awarded to the Aker appellees, to Daly as an individual, Black as an individual, or to any of the appellees related to the dismissed claims of negligence, gross negligence, and business disparagement.

If the court orders dismissal of any "legal action" under the TCPA, the court "shall award" "court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require." Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a). The amount a trial court awards under the TCPA is within the trial court's sound discretion. *See Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016).

Appellants argue that Daly & Black did not need to research step one of the TCPA analysis so thoroughly because appellants conceded the suit fell within the TCPA. However, under these facts, we cannot conclude the trial court abused its discretion in awarding attorney's fees to appellees for researching an issue on which they bore the burden of proof.

Likewise, appellants complain about the amount of time Daly & Black spent researching step two of the TCPA analysis. Appellants assert that because the burden of step two falls on appellants, appellees' research on the topic should have been "minimal." However, it was reasonable for appellees to perform step two research to provide context regarding the relative fault required. The parties actively disputed whether Karam was a private or public figure. Accordingly, we cannot say the trial court abused its discretion in awarding fees for this area of research.

Appellants further complain about the 4.7 hours Daly & Black billed for amending their initial disclosures. According to appellants, amending their disclosures "required essentially no work on the part of [appellees'] counsel." However, based on the record before us reflecting that appellees did need to amend their disclosures of all persons with relevant facts, we cannot say that the trial court

abused its discretion in awarding fees related to amending the initial disclosures.

Appellants also broadly argue that because Daly & Black has expertise on TCPA cases, they should not have needed as much time to prepare for the case. We find this argument unpersuasive. Appellants do not make any specific arguments concerning how appellees' TCPA expertise should have reduced their attorney's fees nor do appellants identify any tasks that were unreasonable because of their expertise. Further, appellants did not offer any specifics as to their position on what a reasonable amount of time incurred would have been on this case given their expertise. Nor did appellants offer any competing expert testimony.

In summary, we conclude that the trial court did not abuse its discretion in its award of reasonable attorney's fees. We overrule appellants' second issue.

## IV. CONCLUSION

We affirm the judgment of the trial court as challenged on appeal.


/s/     Charles A. Spain
Justice

Panel consists of Justices Bourliot, Zimmerer, and Spain.